[Cite as *State v. Roper*, 2022-Ohio-244.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-05-019 |
| | : | O P I N I O N |
| - vs - | | 1/31/2022 |
| | : | |
| JANOS ROPER, | : | |
| Appellant. | : | |

APPEAL FROM CLERMONT COUNTY MUNICIPAL COURT
Case No. CRB 00859

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas A. Horton, Assistant Prosecuting Attorney, for appellee.

Paul Croushore, for appellant.

**S. POWELL, J.**

{¶ 1} Appellant, Janos Roper, appeals his conviction in the Clermont County Municipal Court after a jury found him guilty of three counts of second-degree misdemeanor cruelty against a companion animal following a two-day jury trial. For the reasons outlined below, we affirm Roper's conviction.

**Introduction**

{¶ 2}  On March 5, 2020, the current Chief Dog Warden, Officer Troy Taylor, filed five complaints charging Roper with five counts second-degree misdemeanor cruelty against a companion animal in violation of R.C. 959.131(D)(2).  Pursuant to that statute, it is unlawful for any person who confines or who is the custodian or caretaker of a companion animal to negligently:

> [d]eprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement[.]

{¶ 3}  "[A] dog, regardless of where it is kept, is defined as a companion animal pursuant to R.C. 959.131(A)(1)." *State v. Latocha*, 3d Dist. Shelby No. 17-19-22, 2020-Ohio-2664, ¶ 30.

**Complaints**

{¶ 4}  All five complaints filed by Officer Taylor were given the same case number, 2020 CRB 00859.  As numbered by the trial court, the first complaint related to a dog named "Rusty," the second complaint related to a dog named "Rubio," the third complaint related to a dog named "Rocco," the fourth complaint related to a dog named "Razcal," and the fifth complaint related to a dog named "Mufasa."  It was later determined that the dog named in the second complaint, "Rubio," was one and the same as the dog named in the fifth complaint, "Mufasa."  It was also determined that the fifth complaint, which originally related to a dog named "Mufasa," was actually referring to a dog named "Sneaky."

**Bill of Particulars**

{¶ 5}  On January 8, 2021, the state filed a bill of particulars.  As stated in the bill of particulars, the charges arose after it was alleged Roper had engaged in acts of cruelty

against his five dogs, Rusty, Rubio aka Mufasa ("Rubio"), Rocco, Razcal, and Sneaky, over a nearly two-year period between February 2018 through December 2019. Specifically, as it relates to the five charges brought against Roper, the bill of particulars alleged the following.[1]

*Complaint 1: Rusty*

{¶ 6} As it relates to the first complaint, it was alleged Roper had negligently deprived Rusty, a five-year-old male Italian Mastiff Cane Corso, with the necessary sustenance and sufficient quantities of good, wholesome food and water between February 2018 through December 2019. The bill of particulars alleged that this deprivation resulted in Rusty weighing 106.8 pounds, being "extremely thin, very weak, and near death due to malnutrition and emaciation." The bill of particulars also alleged that since Rusty had been removed from Roper's care and placed in the care of an animal shelter where Rusty had received the necessary sustenance and sufficient quantities of good, wholesome food and water that Rusty's weight increased by approximately 19 pounds to 126 pounds.

*Complaint 2: Rubio*

{¶ 7} As it relates to the second complaint, it was alleged Roper had negligently deprived Rubio, a four-year-and-nine-month-old male Italian Mastiff Cane Corso, with the necessary sustenance and sufficient quantities of good, wholesome food and water between February 2018 through December 2019. The bill of particulars alleged that this deprivation resulted in Rubio weighing 108.6 pounds, being "extremely thin, very weak, and near death due to malnutrition and emaciation." The bill of particulars also alleged that since Rubio had been removed from Roper's care and placed in the care of an animal shelter where Rubio had received the necessary sustenance and sufficient quantities of

---

1. This court has renumbered the counts set forth in the bill of particulars to correspond with the numbering of the complaints, the trial court's jury instructions, and, ultimately, the jury's verdict.

good, wholesome food and water that Rubio's weight increased by approximately 34 pounds to 143 pounds.

*Complaint 3: Rocco*

{¶ 8} As it relates to the third complaint, it was alleged Roper had negligently deprived Rocco, a seven-year-old male Italian Mastiff Cane Corso, with the necessary sustenance and sufficient quantities of good, wholesome food and water between February 2018 through December 2019. The bill of particulars alleged that this deprivation resulted in Rocco weighing 79.8 pounds, being "extremely thin, very weak, and near death due to malnutrition and emaciation." The bill of particulars also alleged that since Rocco had been removed from Roper's custody and placed in the care of an animal shelter where Rocco had received the necessary sustenance and sufficient quantities of good, wholesome food and water that Rocco's weight had increased by approximately 45 pounds to 125 pounds.

*Complaint 4: Razcal*

{¶ 9} As it relates to the fourth complaint, it was alleged Roper had negligently deprived Razcal, a five-year-and-11-month-old male Italian Mastiff Cane Corso, with the necessary sustenance and sufficient quantities of good, wholesome food and water between February 2018 through December 2019. The bill of particulars alleged that this deprivation resulted in Razcal weighing 94.9 pounds, being "extremely thin, very weak, and near death due to malnutrition and emaciation." The bill of particulars also alleged that since Razcal had been removed from Roper's care and placed in the care of an animal shelter where Razcal had received the necessary sustenance and sufficient quantities of good, wholesome food and water that Razcal's weight increased by approximately 32 pounds to 127 pounds.

*Complaint 5: Sneaky*

{¶ 10} As it relates to the fifth complaint, it was alleged Roper had negligently

deprived Sneaky, a female Italian Mastiff Cane Corso of unknown age, with the necessary sustenance and sufficient quantities of good, wholesome food and water between February 2018 through December 2019. The bill of particulars alleged that this deprivation resulted in Sneaky weighing 83 pounds, being "extremely thin, very weak, and near death due to malnutrition and emaciation." The bill of particulars also alleged that that since Sneaky had been removed from Roper's care and placed in the care of an animal shelter where Sneaky had received the necessary sustenance and sufficient quantities of good, wholesome food and water that Sneaky's weight increased by 27 pounds to 110 pounds.

**Jury Trial**

{¶ 11} On March 16 and 17, 2021, a two-day jury trial was held on the matter. During trial, the jury heard testimony from several witnesses. This included testimony from Roper himself. The jury was also presented numerous exhibits for its consideration, many of which were photographs of the five dogs at issue, Rusty, Rubio, Rocco, Razcal, and Sneaky. The following is a summary of the pertinent testimony and evidence presented at that two-day jury trial.

{¶ 12} On December 28, 2019, Roper brought two of his dogs, Rocco and Razcal, to All Creatures Animal Hospital ("ACAH") for boarding and, according to Roper, medical examinations while he was out of town on vacation. Once the two dogs were at ACAH and checked-in by an ACAH employee, Cody S., Rocco and Razcal were escorted back to ACAH's kennels and handed off to ACAH's boarding lead, Britany Reedy.

{¶ 13} Upon being handed off to Reedy, Reedy immediately noticed that Rocco and Razcal looked like they were not being properly cared for given that both dogs were substantially underweight, something which Reedy testified was obvious given their ribs and hipbones were sticking out, their spines were sticking up, and their stomachs were sunken in. Because it was strange for any dog to be brought into ACAH for boarding in

such poor condition, and because Reedy believed the two dogs needed immediate medical attention, Reedy took several photographs of Rocco and Razcal to document their haggard appearance.

{¶ 14} After photographing the two dogs, Reedy then telephoned ACAH's boarding manager, Kasi South. Reedy also text messaged the photographs she had taken of Rocco and Razcal to South for review. Once South reviewed the photographs of Rocco and Razcal, South contacted the now former Chief Dog Warden, Officer Dustin Goodman, who also happened to be South's fiancé, to notify him that she believed Rocco and Razcal were being subjected to "some kind of neglect" by their caretaker, Roper.

{¶ 15} On December 30, 2019, two days after South contacted Officer Goodman about Rocco's and Razcal's condition, Officer Goodman went to ACAH to investigate. Upon his arrival at ACAH, Officer Goodman made contact with both dogs. Asked to describe Rocco's and Razcal's condition upon him first making contact with the two dogs, Officer Goodman testified as follows:

> First impression was very skinny. I could see [the] dogs protruding, hip bones, spine, rib cages. They looked very beat up. Looked, there was scarring, both old and what appeared to be new. There was also damage on their pressure points, like say anywhere they would have laid at. They had, they had sores that were, you know, some you could tell were old but then also a little bit new in the mix of that.

{¶ 16} Officer James Tolle, who was at that time serving as Officer Goodman's Assistant Chief Dog Warden, went with Officer Goodman to ACAH to investigate South's complaint. Also asked to describe Rocco's and Razcal's condition upon first encountering the two dogs, Officer Tolle testified as follows:

> Very emaciated. Ribs showing. Weak. The[re] were scars all over them. Scabs like from back behind their legs. Real calm dogs. But, you know, seemed to be pretty hungry and pretty weak when we got there.

{¶ 17} After viewing Rocco's and Razcal's gaunt appearance, Officer Goodman recognized Rocco and Razcal as two of Roper's dogs that were having "issues" earlier that year. Because he knew Roper owned three other dogs besides Rocco and Razcal, i.e., Rusty, Rubio, and Sneaky, Officers Goodman and Tolle set out to obtain a search warrant for Roper's home, something which they did on January 2, 2020. Once the search warrant was obtained, Officers Goodman and Tolle proceeded to Roper's home to execute the search warrant. Officer Goodman testified that he did this because he feared Rusty, Rubio, and Sneaky were possibly "losing their life per se."

{¶ 18} Once Officers Goodman and Tolle arrived at Roper's home, Roper's brother, Jermaine, opened the door and let the two officers inside. Officer Goodman then proceeded through Roper's home and towards a door that led out into Roper's garage where, as Officer Tolle testified, "you could hear [a] dog just going crazy in the garage." Officer Goodman then opened the door and saw nothing but complete darkness. Officer Goodman also heard a dog growling inside. Officer Goodman then took out his flashlight and shined the light into the garage where he saw one of Roper's dogs, Rubio, standing on the opposite side of the garage. Officer Goodman also saw space heaters hanging from the ceiling and a significant amount of dog feces and urine covering the floor.

{¶ 19} After carefully approaching Rubio, Officer Goodman was able to gain control of the dog and transport him to a nearby dog shelter. Upon Officer Goodman's return from the dog shelter, Officers Goodman and Tolle went into Roper's backyard to get Rusty and Sneaky. Once there, Officer Goodman noticed what appeared to be a makeshift doghouse, as well as a homemade food dispenser that consisted of a five-gallon bucket with a two-inch triangular opening at the bottom where a small bit of dog food could fall through if properly pawed at by a dog. Officer Goodman testified that he had never seen anything like that before. Officers Goodman and Tolle also testified that they believed such a

contraption would not provide sufficient food for dogs like Rusty and Sneaky. As for water, the record indicates that there was a water bowl in the backyard, but that the water had frozen over and turned to ice, which, as Officer Tolle testified, was "really alarming."

{¶ 20} Dr. Kristine Raab, a veterinarian at ACAH, examined Rocco, Razcal, Rubio, Rusty, and Sneaky after they were removed of Roper's custody. Dr. Raab first examined Rocco and Razcal on December 30, 2019. As for Rocco, Dr. Raab noticed that he needed immediate medical attention because he "looked like he was starving to death," "extremely underweight," and "severely malnourished." Specifically, as Dr. Raab testified about Rocco:

> There was no body fat on his entire body. You could visibly see his ribs, his vertebrae, his hips, his hipbones were starting to protrude as well. His hair coat, it looked to like 50% or so of his hair coat was just gone that that's an indicator of malnourishment. There were healed scars on his head and neck. There were fresher puncture wounds on his neck and head. Both of his elbows and his hocks, which is like their ankle, were swollen, red, infected. Those are pressure points on a dog's body. And all four were infected on Rocco.

{¶ 21} Dr. Raab noticed the same issues were also present on Razcal. This includes Razcal being significantly underweight and having no body fat on his entire body, as well as Razcal having easily visible ribs, vertebrae, and hip bones. Specifically, as Dr. Raab testified about Razcal:

> Razcal needed medical attention. He was very similarly very emaciated, very poor hair coat, malnourishment. He had similar injuries on his elbows and his hocks. He also had scars on his head and neck region. He had evidence of fresh wounds. His right earflap had about a three inch laceration that was full thickness through the… laceration through the ear that had healed and scarred.

{¶ 22} Dr. Raab examined Rubio, Rusty, and Sneaky on May 23, 2020, several months after they had been removed from Roper's custody and placed in the care of the dog shelter. Dr. Raab's examination of Rubio found him to be an intact (unneutered), healthy, and beautiful dog. The record indicates that Rubio's appearance during Dr. Raab's

examination was drastically different than how Rubio previously appeared when under the custody and care of Roper. Specifically, as Dr. Raab testified about Rubio's appearance upon his removal from Roper's care:

Q. Looking at this photo of Rubio what, what are we looking at?

A. * * * [T]he first thing that I do when I look at a dog visually is to body score them. That's how we access them but I'd probably put him at a three out of nine. * * *

Q. Now right around the time this photo was taken, Rubio weighed 106.2 pounds?

A. Um-hum.

Q. Is that a healthy weight based off this picture?

A. No.

Q. What's wrong with that weight?

A. It's too low.

{¶ 23} Dr. Raab's examination of Rusty also found him to be an intact (unneutered), healthy, and beautiful dog now that he had been removed from Roper's custody. Outside of the arthritis in her knees, as well as the fact that she had been spayed, Dr. Raab found the same to be true for Sneaky. But, just as with Rubio, Dr. Raab testified that this was not the case when Sneaky was initially removed from Roper's care. Specifically, as Dr. Raab testified about Sneaky's condition upon her removal from Roper's custody several months earlier:

Q. Do you recall what [Sneaky's] weight was [upon her removal from Roper's care]?

* * *

A. 83 pounds.

* * *

Q. Is 83 pounds a healthy weight for a female * * * Cane Corso?

- 9 -

A. No.

Q. What's wrong with it?

A. It's too low.

{¶ 24} Because she was a female, Dr. Raab testified that Sneaky should have ideally weighed somewhere between 105 and 130 pounds. This was slightly less than a male, who Dr. Raab testified should weigh anywhere between 105 to 160 pounds depending on the dog's features and body frame. The record indicates that as of January 11, 2021, approximately one year after the five dogs were removed from Roper's custody and care, Rusty weighed 118 pounds, Rubio weighed 128 pounds, Rocco weighed 124 pounds, Razcal weighed 131 pounds, and Sneaky weighed 108 pounds, which, as noted above, were all weights within the range Dr. Raab testified would constitute a healthy weight for an Italian Mastiff Cane Corso.

{¶ 25} Continuing her testimony, Dr. Raab testified that the way Roper had been feeding his five dogs – with a homemade food dispenser consisting of a five-gallon bucket that had a triangular two-inch opening at the bottom where food could fall through if properly pawed at by a dog – was not the proper way to feed a family of dogs, regardless of the breed. When asked what was wrong with Roper feeding his dogs in this manner, Dr. Raab testified:

> Many things. So certainly an owner, a person cannot know for sure how much food each dog is getting. If the dogs are not supervised when they're outside they cannot be sure of the interaction between the dogs at all. If there is dominance, you know, dogs bullying each other if you will.

Dr. Raab also testified that none of Roper's five dogs were suffering from any medical condition, like cancer, that would have caused them to lose such significant amounts of weight.

- 10 -

{¶ 26} Moving then to her expert opinion as it relates to all five of Roper's dogs, Rusty, Rubio, Rocco, Razcal, and Sneaky, Dr. Raab testified:

> So after reviewing everything, how the dogs presented to me, looking over the histories and their weights, my conclusion was that the way the dogs were housed ultimately led to the state they were in with such low condition scores and non-nourishment. The feeding arrangements, they had food there. They weren't eating the food. They weren't getting enough food. Because of the way they were housed and fed, they were not supervised, they… Mr. Roper was not making sure that the dogs were getting enough food.

{¶ 27} Continuing with her expert opinion, Dr. Raab testified:

> Yeah, so the dogs were obviously underweight. Mr. Roper was in charge of the food and care of these animals. He lived with the animals, watching their weight drop and then get thinner and thinner. * * * The animals were losing weight. I have evidence in the medical records of their weights being normal years prior. So the dogs were getting thinner, continued ultimately Razcal lost 39% of his body weight after I reviewed the records. Rocco lost 39% of his body weight. We had previous weights on him. The point is they got to that weight; nothing was done to stop it. It could have been prevented.

{¶ 28} Concluding her expert opinion, Dr. Raab testified:

> Mr. Roper presented the dogs to [ACAH] knowing they needed vaccinations and they would be examined by the veterinarian. [He should have] expect[ed] repercussions of this. * * * I do not know how many dogs, how, how they were fed. How many dogs were put outside at a time but clearly one dog was not fed at a time and supervised and getting enough food. And I can state that as a fact based on everything I've observed.

{¶ 29} Dr. Raab's report setting forth her expert opinion was subsequently admitted into evidence without objection.

**Jury's Verdict and Sentence**

{¶ 30} After both parties rested, the trial court provided its final instructions to the jury, explicitly stating that Count 1 related to Rusty, Count 2 related to Rubio, Count 3 related to Rocco, Count 4 related to Razcal, and Count 5 related to Sneaky. Following its

- 11 -

deliberations, the jury returned a verdict finding Roper not guilty of Count 1 and Count 2 related to Rusty and Rubio, but guilty of Count 3, Count 4, and Count 5 regarding Rocco, Razcal, and Sneaky. Approximately three weeks later, on April 6, 2021, the trial court held a sentencing hearing and sentenced Roper to a suspended 90-day jail sentence and a five-year community control term. The trial court also ordered Roper to complete 100 hours of community service, to forfeit all current dogs and companion animals in his care, and to pay a $300 fine plus court costs. Roper now appeals his conviction, raising two assignments of error for review.

**Roper's Appeal**

{¶ 31} Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING OPINION TESTIMONY BY UNQUALIFIED PERSONS WHO HAD NOT BEEN DECLARED TO BE EXPERTS.

{¶ 33} In his first assignment of error, Roper argues the trial court erred by permitting Reedy, ACAH's boarding lead, to offer her expert opinion about Rocco's and Razcal's condition upon her initial contact with the two dogs at ACAH, as well as the cause of that condition, "despite her lack of qualifications and absence of an expert report." To support this claim, Roper cites Evid.R. 702, outlining the qualifications for a witness to testify as an expert, and Crim.R. 16(K), requiring an expert witness to prepare and disclose to the other side a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion no later than 21 days prior to trial.[2] Despite Roper's claims,

---

2. Within his first assignment of error, Roper also alleges the trial court erred by permitting Officer Goodman and Dr. Raab to offer their expert opinion as to "the condition of the dogs and their opinions of the cause of that condition." Roper, however, does not provide any argument in support of his allegations, nor does Roper specifically cite to any of Officer Goodman's and Dr. Raab's testimony that he finds objectionable. Therefore, because Roper's argument contained within his first assignment of error deals exclusively with the testimony offered by Reedy, so, too, will this court's discussion of Roper's first assignment of error.

however, the record plainly reveals that Reedy did not testify as an expert witness under Evid.R. 702. The record instead firmly establishes that Reedy testified as a lay witness in accordance with Evid.R. 701.

{¶ 34} "[A] 'lay witness' is defined as one who does not testify as an expert and is restricted to 'giving an opinion or making an inference that (1) is based on firsthand knowledge, and (2) is helpful in clarifying the testimony or in determining facts.'" *State v. Fread*, 12th Dist. Butler No. CA2013-03-045, 2013-Ohio-5206, ¶ 14, quoting Black's Law Dictionary 1633 (8th Ed.2004). Pursuant to Evid.R. 701, a lay witness may testify in the form of opinions or inferences if the opinions or inferences are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." That is exactly what occurred here. That is, Reedy testified about her observations and her first-hand account of Rocco's and Razcal's haggard appearance and obvious malnourishment upon Reedy first having contact with the two dogs. Therefore, because Reedy testified as a lay witness in accordance with Evid.R. 701, and because Crim.R. 16(K) is inapplicable to lay witness testimony, *see State v. Jones*, 12th Dist. Warren No. CA2021-04-038, 2021-Ohio-4117, ¶ 40, the trial court did not err by permitting Reedy to testify in the manner that she did.

{¶ 35} Regardless, even if this court were to find merit to Roper's argument, which we do not, Reedy's testimony about her observations and her first-hand account of Rocco's and Razcal's condition was cumulative to the testimony offered by several other witnesses. This includes the testimony offered by ACAH's boarding manager, South, as well as Officer Goodman, Officer Tolle, and Dr. Raab. Therefore, because Reedy's testimony was merely cumulative to the testimony offered by several other witnesses, none of which Roper objected to at trial, the admission of Reedy's testimony would be harmless even if it had been admitted in error. *See State v. Smith*, 12th Dist. Clermont No. CA2019-10-075, 2020-

Ohio-4008, ¶ 46 ("because H.H. testified and the statements elicited were merely cumulative of statements H.H. made during her testimony, their admission would be harmless even if they had been admitted in error"). "It is well-established that harmless trial errors are to be disregarded and the erroneous admission of evidence is not reversible unless it affects a substantial right that prejudices the defendant." *In re A.M.I.*, 12th Dist. Warren No. CA2014-07-095, 2015-Ohio-367, ¶ 19, citing Crim.R. 52(A) ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded"). That is simply not the case here. Accordingly, for these reasons, Roper's first assignment of error lacks merit and is overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE TRIAL COURT ERRED IN DENYING MR. ROPER'S MOTION TO DISMISS AT THE CONCLUSION OF THE PROSECUTION.

{¶ 38} In his second assignment of error, Roper argues the trial court erred by denying his Crim.R. 29(A) motion for acquittal. We disagree.

{¶ 39} The standard of review for a denial of a Crim.R. 29(A) motion for acquittal is the same as the standard of review for a sufficiency of the evidence claim. *State v. Robinson,* 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 37. Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead,* 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v.*

*Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33.

{¶ 40} As noted above, Roper was convicted of three counts of second-degree misdemeanor cruelty against a companion animal in violation of R.C. 959.131(D)(2). As previously stated, that statute makes it unlawful for any person who confines or who is the custodian or caretaker of a companion animal, in this case, a dog, to negligently:

> [d]eprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement[.]

{¶ 41} To support this assignment of error, Roper argues the trial court erred by denying his Crim.R. 29(A) motion for acquittal because the state failed to prove he "caused injury" to Rocco, Razcal, and Sneaky.[3] Roper instead argues the trial court should have granted his Crim.R. 29(A) motion for acquittal because the state failed to prove he had "mistreated or neglected" those three dogs, but only that he was "*in possession*" of three "underweight" dogs. (Emphasis sic.) Therefore, according to Roper, because the trial court "erroneously focused on effect rather than cause" and "assumed causation without evidence," the trial court erred by denying his Crim.R. 29(A) motion for acquittal. However, despite Roper's claims we find the record contains sufficient evidence to support the trial court's decision to deny Roper's Crim.R. 29(A) motion for acquittal as it relates to the three dogs at issue, Rocco, Razcal, and Sneaky.

---

3. Within his second assignment of error, Roper argues the trial court erred by denying his Crim.R. 29(A) motion for acquittal as it relates to all five dogs, Rusty, Rubio, Rocco, Razcal, and Sneaky. However, because Roper was found guilty of being cruel to just three of those five dogs, Rocco, Razcal, and Sneaky, we will limit our review of Roper's second assignment to just those three dogs.

- 15 -

{¶ 42} As set forth more fully above, the state provided competent, credible evidence that Rocco, Razcal, and Sneaky were all severely underweight at the time those three dogs were removed from Roper's custody and care. The state also provided evidence that once out of Roper's custody, and when placed in the care of a dog shelter where they were provided with the appropriate care, including the necessary sustenance and sufficient quantities of good, wholesome food and water, Rocco, Razcal, and Sneaky had all gained a significant amount of weight, thereby allowing them to become, according to Dr. Raab's testimony, healthy and beautiful dogs. This can be most easily seen by the following table:

| Dog Name | At Time of Removal | One Year After Removal |
| --- | --- | --- |
| **Rocco** | 79.2 pounds (12/30/2019) | 124 pounds (1/11/2021) +44.8 pounds |
| **Razcal** | 94.9 pounds (12/30/2019) | 131 pounds (1/11/2021) +36.1 pounds |
| **Sneaky** | 83 pounds (1/10/2020) | 108 pounds (1/11/2021) +25 pounds |

{¶ 43} Based on this table, and when considering the significant amount of weight Rocco, Razcal, and Sneaky gained in the time following their removal from Roper's custody, it is clear that Roper was not providing any of these three dogs with the necessary sustenance and sufficient quantities of good, wholesome food and water. Roper was instead providing these three dogs with the bare minimum to keep them alive. This is certainly cruel and a clear violation of R.C. 959.131(D)(2) as it relates to each of the three dogs at issue. To claim otherwise, like Roper did during trial, is to deny reality and the real possibility that Rocco, Razcal, and Sneaky would have died of starvation if they had not been removed from Roper's care when they were. This holds true even if the evidence showed only that Rocco, Razcal, and Sneaky were underweight, but not necessarily emaciated, as Roper seems to suggest. *See, e.g., State v. Schuler*, 12th Dist. Butler No.

CA2018-04-067, 2019-Ohio-1585, ¶ 32-35 (conviction for cruelty to animals in violation of R.C. 959.131[D][2] was supported by sufficient evidence where the evidence established that the dog at issue was underweight, but not necessarily emaciated, because "a lesser degree of nutritional deprivation may be sufficient to sustain a conviction if the animal is not receiving enough food to meet the needs of the situation"). Therefore, for these reasons, Roper's second assignment of error also lacks merit and is overruled.

### Conclusion

{¶ 44} For the reasons outlined above, and finding no merit to any of the arguments advanced by Roper herein, Roper's conviction for three counts of second-degree misdemeanor cruelty against a companion animal is affirmed.[4]

{¶ 45} Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.

---

4. We note that, as part of his appellate brief, Roper also alleges the jury erred in finding him guilty because the state failed to provide evidence of the "requisite culpable mental state," negligence. Roper, however, does not provide any argument in support of this claim, nor does Roper present this claim within an assignment of error. Roper's claim is instead made as part of his appellate brief's conclusionary paragraph. Pursuant to App.R. 12(A)(1)(b) and (c), this court rules on the assignment(s) of error presented, not on unsupported claims contained within an appellate brief's conclusory paragraph. But, even if Roper had properly presented this argument for this court's consideration, the state provided more than enough evidence to demonstrate Roper acted, at the very least, negligently to support a conviction for three counts of second-degree misdemeanor cruelty against a companion animal.