[Cite as *State v. Harris*, 2023-Ohio-2013.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|                          |   |                          |
|--------------------------|---|--------------------------|
| STATE OF OHIO,           | : |                          |
| Appellee,                | : | CASE NO. CA2022-09-024   |
|                          | : | O P I N I O N            |
| - vs -                   |   | 6/20/2023                |
|                          | : |                          |
| JOHN M. HARRIS II,       | : |                          |
| Appellant.               | : |                          |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 20225036

Andrew W. McCoy, Clinton County Prosecuting Attorney, and Robert C. Logsdon, Assistant Prosecuting Attorney, for appellee.

The Law Office of John D. Hill, LLC, and John D. Hill, Jr., for appellant.

**S. POWELL, P.J.**

{¶ 1} Appellant, John M. Harris II, appeals his conviction in the Clinton County Court of Common Pleas after a jury found him guilty of single counts of burglary, grand theft, and theft. For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2} On February 28, 2022, the Clinton County Grand Jury issued an indictment

charging Harris with the three above-named offenses, two third-degree felonies and one fifth-degree felony. The charges arose after Harris was alleged to have broken into Cindy and Chris Warren's home located on US 68 South in Blanchester, Clinton County, Ohio on December 9, 2020.[1] Once inside, Harris was alleged to have stolen various items belonging to the Warrens valued at over $1,000 but less than $7,500. These items included the Warrens' riding lawnmower, garden trailer, weed eater, chain saw, various household electronics, clothing, toys, a pocket watch, jewelry, and a .22-caliber rifle.

{¶ 3} Harris, who was at that time homeless, was also alleged to have eaten the Warrens' food and drank the Warrens' soda pop they had purchased for their son. This included an 8 oz. can of Sprite that was found discarded and empty just outside the Warrens' back deck door shortly after the burglary took place. This empty can of Sprite was later collected by Deputy Dewey Allen with the Clinton County Sherriff's Office and tested for DNA by Kathryn Dailey, an expert DNA forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"). The results of this DNA test returned a DNA profile located on that empty can of Sprite that had a statistical probability of matching someone other than Harris at over one in a trillion.

{¶ 4} On March 11, 2022, Harris appeared before the trial court for his arraignment and entered not guilty pleas to all three charges. A few months later, on July 5, 2022, the trial court held a pretrial hearing. During this hearing, a proposed plea agreement was placed on record by the state. This proposed plea agreement would have required Harris to serve just 12 months in prison and pay $1,800 in restitution to the Warrens in exchange for Harris pleading guilty to burglarizing the Warrens' home and stealing the Warrens' .22-caliber rifle. Harris, however, rejected the state's plea offer and instead chose to take the

---

1. To protect their privacy, and for purposes of readability, we have changed the victim's names to Cindy and Chris Warren for purposes of issuing this opinion.

matter to trial.

**{¶ 5}** On August 29 and 30, 2022, the trial court held a two-day jury trial on the matter. During that trial, the jury heard testimony from a total of ten witnesses offered by the state. This included testimony from both Cindy and Chris Warren. This also included testimony from Deputy Allen and expert DNA forensic scientist Kathryn Dailey. Harris did not himself testify at trial, nor did Harris offer any witnesses in his defense. The following is a summary of the relevant testimony and evidence presented by the state at trial.

*Summary of Relevant Trial Testimony and Evidence*

**{¶ 6}** On the afternoon of December 9, 2020, Cindy returned home from work and, upon opening the home's garage door, realized the garage was "a really, really big mess." Cindy also noticed some items that were out of place or missing from the garage. Thinking this odd, Cindy then went to open the garage's interior door leading into the house. The door, however, was locked. Cindy, realizing that something was wrong, called her husband, Chris, and asked if he had come home and, "you know, take[n] something to work." Chris responded, no, he had not been home, had not moved anything, had not taken anything from the garage to work that day. Upon hearing this, Cindy said to Chris, "well, we have a problem, I can't get in the house."

**{¶ 7}** After speaking with her husband, Cindy then went to see if the front door was unlocked. It was not. Cindy then noticed that the shed located in the backyard was open and that the riding lawnmower was gone. Upon seeing this, Cindy called 9-1-1 to report that her house had been broken into and that both her and her husband Chris' belongings were missing. After contacting the police, Cindy then went around to the back of the house where she realized "that the back door was cracked open, and that the back window was broken." The Warrens' neighbor later testified that she had seen a man with some of the same physical features as Harris driving the Warrens' lawnmower with attached garden

- 3 -

trailer approximately one hour prior to Cindy returning home from work on the day of the burglary, December 9, 2020.

{¶ 8}   After receiving Cindy's call for help, deputies with the Clinton County Sheriff's Office were dispatched to the Warrens' home for assistance.   Upon their arrival, the deputies determined that whoever had broken into Warrens' home had left and was no longer on the property.  Cindy, as well as Chris, who had since returned home from work to be with his wife, then went inside and discovered that their house was "completely destroyed," that the TV had been "ripped off the wall," that the house "was a mess" and "in shambles," and that "all the Christmas stuff" had been "torn into."  This was in addition to Cindy noticing that "a bunch of items" had been taken out of their refrigerator and the pantry. This included the Sprite they had purchased for their son.

{¶ 9}   After surveying the damage inside their house, Chris then went outside to the back deck where he found two of their vacuum cleaners, as well as "TVs, furniture, book bags all stuffed up underneath the back of the deck" that were "just thrown up under the deck ready to go."  Cindy testified that Chris also "noticed that there was a bunch of like, chip bags and empty pop cans and stuff."  Cindy testified that this was odd because she and Chris "don't do that" and that they "don't make messes like that."  According to both Cindy and Chris, this was because there were raccoons on the property and that, "when you live out in the country, you get lots of critters," so it is not a good idea to "leave a mess like that out."

{¶ 10} After surveying the damage, Chris told the sheriff's deputies on scene about the empty soda cans located in the backyard.  Chris testified that he did this because "that wasn't something that was normal, and was off about the situation."  One of those empty soda cans was an 8 oz. can of Sprite sitting on the railing of the Warrens' back deck approximately 20 feet away from the back deck door.  This can was then collected as

evidence by Deputy Allen. Deputy Allen testified that he did this in accordance with the standard evidence collecting procedures employed by the Clinton County Sheriff's Office. This required Deputy Allen to put the empty can of Sprite into a sealed manilla envelope and, once transported to the Clinton County Sherriff's Office, log the sealed envelope into a secure evidence locker. Deputy Allen testified he did this all while wearing rubber gloves.

{¶ 11} Once collected as evidence by Deputy Allen, the empty Sprite can was then sent to BCI for DNA testing. This testing was conducted by expert DNA forensic scientist, Kathryn Dailey. The DNA test results came back with a DNA profile that was a statistical match to Harris given that the DNA profile found on the empty can of Sprite had an over one in a trillion chance of matching anyone other than Harris. However, as Chris testified, he did not know Harris, had never met or seen Harris, and there was no reason whatsoever that a DNA profile matching Harris would be found on his and his wife Cindy's property on the day of the burglary, December 9, 2020, or any other day.

{¶ 12} On December 10, 2020, the Clinton County Sheriff's Office received a report of an active burglary that involved a man wearing a dark-colored hoodie driving a riding lawnmower through a field with an attached garden trailer covered by a blue tarp approximately two miles from where the Warrens' home is located. Deputy Tim Smith with the Clinton County Sheriff's Office was dispatched to investigate this burglary. Upon his arrival, Deputy Smith took off running through the field towards the man on the lawnmower. Deputy Smith was able to get within 15 yards of the lawnmower before, as Deputy Smith testified, the man "caught me out of the corner of [his] eye as I was running up to [him], and [he] bolted." Deputy Smith testified the man then "[g]ot off the riding mower, and then ran down a tree line away from me down over a slope and out of sight."

{¶ 13} Undeterred, Deputy Smith continued to pursue the man on foot. Unfortunately, Deputy Smith was unable to locate the man once the man ran back into the

woods and hid. After breaking off his search, Deputy Smith then returned to the field with the lawnmower and removed the blue tarp from the attached garden trailer. Upon removing the tarp, Deputy Smith testified that he discovered "a various amount of property in the trailer that was attached to the mower including a firearm." Due to the close proximity of the lawnmower to the Warrens' home, deputies with the Clinton County Sheriff's Office contacted Chris to see if he could identify the lawnmower, the trailer, and the other property located within the trailer as his. Believing the items were his, Chris went to the field where the lawnmower was located and positively identified the lawnmower as his and Cindy's. Chris also positively identified the trailer, bags of clothes, toys, various Christmas presents, and .22-caliber rifle located in the trailer as items belonging to either him or Cindy.

{¶ 14} The next day, on December 11, 2020, Chris went into the surrounding woods with his father-in-law to see if they could find any more of his and Cindy's stolen property. Chris did this after finding "more bags of stuff" belonging to him and his wife hidden across the street underneath a pine tree, in the bushes, and scattered through the tall weeds near a vacant house. Upon entering the woods, Chris and his father-in-law located an old deer blind that contained more of the items that had been stolen from the Warrens' home two days earlier. This included a big screen TV, weed eater, chain saw, jack stands, car parts, sleeping bags, and an unopened package of toilet paper.

{¶ 15} It was later discovered that there were trail cameras stationed next to the deer blind that had taken photographs of a male subject with similar features to Harris entering that blind and camping out after the Warrens' house had been burglarized. The male subject photographed by those trail cameras was also wearing similar clothing to what Harris had in his possession at the time of his arrest. Chris testified that all told, the property stolen from the home had a replacement value of approximately $7,000. Harris was subsequently arrested and, while being interrogated, acknowledged that he might know the

whereabouts of the pocket watch that had been stolen from the Warrens' home.

*The Jury's Verdict and the Trial Court's Sentence*

{¶ 16} Once both parties rested, the jury was excused from the courtroom for deliberations. Just under two hours later, the jury returned to the courtroom with a verdict finding Harris guilty of all three offenses. The following week, on September 7, 2022, the trial court held a sentencing hearing where it sentenced Harris to a 30-month prison term, less 181 days of jail-time credit. The trial court also ordered Harris to pay court costs, as well as $1,800 in restitution to the Warrens. The trial court further notified Harris that he would be subject to an optional period of up to three years postrelease control upon his release from prison. Shortly after this hearing concluded, the trial court issued a judgment entry of sentence. As part of that entry, the trial court noted that it had "attempted on multiple occasions to rehabilitate [Harris] locally without success." The trial court also noted that Harris' "adult criminal history spans nearly three decades," that Harris "continues to be a continuing menace and threat to public safety," and that Harris' "misconduct caused significant harm both financially and emotionally to the victims."

**Harris' Appeal and Two Assignments of Error**

{¶ 17} Harris now appeals his conviction, raising two assignments of error for review. In his two assignments of error, Harris argues the jury's verdicts finding him guilty of burglary, grand theft, and theft of the Warrens' home were not supported by sufficient evidence. Harris also argues the jury's verdicts finding him guilty of those three offenses were against the manifest weight of the evidence. To support this claim, however, Harris does not dispute any specific element as it relates to each of those three offenses. Harris instead challenges jury's verdicts identifying him as the perpetrator who burglarized the Warrens' home and stole the Warrens' property. Harris' challenge lacks merit.

*Rule of Law and Standards of Review*

{¶ 18} It is well established that, "[i]n order to warrant a conviction, the evidence presented must establish beyond a reasonable doubt the identity of the accused as the person who actually committed the crime." *State v. Harris*, 12th Dist. Butler No. CA2007-11-280, 2008-Ohio-4504, ¶ 12. This necessarily means the jury's verdict identifying the defendant as the perpetrator must be supported by sufficient evidence. *See State v. Helvey*, 12th Dist. Butler No. CA2021-01-008, 2022-Ohio-98, ¶ 19 ("[t]he state is required to prove a perpetrator's identity beyond a reasonable doubt"), citing *State v. Cook*, 65 Ohio St.3d 516, 526 (1992). This also means the jury's verdict identifying the defendant as the perpetrator must not be against the manifest weight of the evidence. *See, e.g., State v. Raleigh*, 12th Dist. Clermont Nos. CA2009-08-046 and CA2009-08-047, 2010-Ohio-2966, ¶ 44-51 (jury's verdict identifying appellant as the perpetrator of a burglary was not against the manifest weight of the evidence where the evidence established "that appellant was the man [who was] witnessed entering the [victim's] home, and that appellant's actions at the [victim's] home constituted a burglary"). Under these circumstances, we apply the following sufficiency of the evidence and manifest weight of the evidence standards of review.

{¶ 19} "A claim challenging the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 165, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997). To that end, "[w]hen reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. In so doing, "[t]he relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt.'" *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "This test 'requires a determination as to whether the state has met its burden of production at trial.'" *State v. Thompson*, 12th Dist. Butler No. CA2022-09-080, 2023-Ohio-559, ¶ 34, quoting *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34.

{¶ 20} On the other hand, "a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26. That is to say, "[a] manifest weight of the evidence challenge examines the 'inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *State v. Dean*, 12th Dist. Madison Nos. CA2021-08-013 and CA2021-08-014, 2022-Ohio-3105, ¶ 62, quoting *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. When determining whether a jury's verdict is against the manifest weight of the evidence, this court must "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses," and "determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168. Applying this standard requires this court to function as a "thirteenth juror." *State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. However, although acting as a "thirteenth juror," this court will overturn a conviction for being against the manifest weight of the evidence only in extraordinary circumstances where the evidence weighs heavily in favor of acquittal. *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

*Harris' Arguments and Analysis*

{¶ 21} Harris argues the jury's verdict identifying him as the perpetrator of the burglary, grand theft, and theft that took place at the Warrens' home must be reversed for two reasons: (1) the clothing the perpetrator was seen wearing in the days following the break-in of the Warrens' home was different than the clothing that he was wearing at the time of his arrest; and (2) the DNA evidence linking him to the crime does not "speak to the circumstances" under which his DNA made its way to the Warrens' home. However, although we agree that the clothing the perpetrator was seen wearing in the days following the break-in was different than the clothing Harris was wearing at the time of his arrest, and while it may be true that the DNA evidence linking Harris to the break-in does not "speak to the circumstances" under which his DNA ultimately made its way to the Warrens' home, the evidence elicited at trial was still more than enough to support the jury's verdict identifying Harris as the perpetrator. The jury's verdict identifying Harris as the perpetrator was also not against the manifest weight of the evidence. This holds true despite Harris' claim that, at least according to him, the state's theory of the case did not "make a whole lot of sense" and was "fundamentally incongruent" to the facts presented at trial.

{¶ 22} "There is no requirement that an accused must be identified as the perpetrator by a witness testifying in court or during a photo lineup." *State v. Hibbard*, 12th Dist. Butler No. CA2022-09-086, 2023-Ohio-983, ¶ 20. "The identity of the accused as the perpetrator of the crime may [instead] be established by direct or circumstantial evidence." *State v. Jividen*, 12th Dist. Warren No. CA2020-10-067, 2021-Ohio-2720, ¶ 11. "[C]ircumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990). This may occur in circumstances "'where the inference of the happening of the criminal act complained of is the only probable or natural explanation of the proven facts and circumstances.'" *Raleigh*, 2010-Ohio-2966 at ¶ 53. For example, "the

unexplained possession of recently stolen property presents a permissive inference that the accused is guilty of theft or burglary." *State v. Bice*, 12th Dist. Clermont No. CA2008-10-098, 2009-Ohio-4672, ¶ 31.

{¶ 23} The evidence in this case, both direct and circumstantial, establishes that Harris left his DNA profile on an empty Sprite can located just outside the Warrens' home either during or immediately after the break-in. The evidence also establishes that, at both the time of the robbery and in the days after the Warrens' home was broken into, a man similar looking to Harris was observed in possession of the Warrens' stolen property. This includes witnesses observing a man with similar physical attributes to Harris driving the Warrens' stolen lawnmower with an attached trailer full of the Warrens' stolen property. This is in addition to the evidence that a man resembling Harris was observed on video returning to an old deer blind where a significant amount of the Warrens' stolen property had been hidden for retrieval at a later date.

{¶ 24} The jury, exercising its logic and common sense, considered this evidence and concluded that the identity of the perpetrator who broke into the Warrens' home and stole the Warrens' property was Harris. This was not an error. *See, e.g., Helvey*, 2022-Ohio-98 at ¶ 19-21 (appellant's identity as the perpetrator of a crime was established where DNA evidence linked appellant to the scene of the crime and where witness testimony identified appellant as looking "very similar" to the perpetrator of the crime). To hold otherwise on these facts would make over one in a trillion DNA evidence linking Harris to the break-in of the Warrens' home virtually meaningless when, in reality, the exact opposite is true. This is particularly true in this case given the uncontradicted testimony elicited from Kathryn Dailey, an expert DNA forensic scientist, regarding the highly unlikely possibility of cross-contamination that would have resulted in Harris' DNA profile appearing on something that Harris had not touched. Therefore, because the jury's verdict identifying Harris as the

perpetrator of the burglary, grand theft, and theft of the Warrens' home was supported by sufficient evidence and was not against the manifest weight of the evidence, Harris' two assignments of error lack merit and are overruled.

## Conclusion

{¶ 25} For the reasons outlined above, and finding no merit to any of the arguments advanced by Harris herein, Harris' appeal challenging his conviction for single counts of burglary, grand theft, theft is denied.

{¶ 26} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.