[Cite as *In re P.M.S.*, 2023-Ohio-3825.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| P.M.S. | : | CASE NO. CA2022-05-036 |
| | : | O P I N I O N<br>10/23/2023 |
| | : | |
| | : | |
| | : | |


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 21-N000633


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Dearie, Fischer & Mathews LLC, and John A. Fischer, for appellant.


**BYRNE, J.**

{¶ 1} Appellant, "Paul,"[1] a minor, appeals his adjudication of delinquency for committing rape. After reviewing the evidence, we affirm the adjudication.

**I. Facts and Procedural History**

---

1. This is a pseudonym that we use in this opinion for purposes of privacy and readability. *In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn.1.

{¶ 2} In 2021, Paul was charged in Hamilton County Juvenile Court with six counts of rape and two counts of gross sexual imposition for engaging in sexual activity with "Charles,"[2] a minor, earlier that year while the two of them were roommates at a youth home. The case was tried in November 2021 to a magistrate.

{¶ 3} At trial, the state presented the testimony of two witnesses. Kelvin Satterwhite, the youth-home supervisor, testified that one evening in March he caught 14-year-old Paul and 15-year-old Charles engaging in anal intercourse behind the shed outside the youth home. Satterwhite said that he saw Charles bent over and that Paul was behind him with both hands around Charles's waist thrusting against him. Charles then testified about his sexual activity with Paul. Charles said that once in a vehicle, Paul had forced him to fellate him (Paul) by holding his head down in his lap. Regarding the activity behind the shed that Satterwhite saw, Charles said that Paul had made him pull his pants down and had forced him to engage in anal intercourse by holding his legs. Charles said that he had not wanted to do it and that he had told Paul no and had tried to get him to stop.

{¶ 4} At the end of the trial, the magistrate adjudicated Paul delinquent, finding that he had compelled Charles by force to engage in fellatio and anal intercourse, violations of the rape statute, R.C. 2907.02(A)(2). The other charges were dismissed for insufficient evidence. Paul filed objections to the magistrate's decision. On January 20, 2022, the Hamilton County Juvenile Court concluded after an independent review that the evidence was not sufficient to prove forced fellatio but was sufficient to prove that Paul had forced Charles to engage in anal intercourse. Accordingly, the juvenile court adopted the magistrate's adjudication of delinquency.

{¶ 5} Pursuant to Juv.R. 11, the Hamilton County Juvenile Court transferred the

---

2. This is another pseudonym, used for purposes of privacy and readability.

proceeding to Warren County, which was the county of Paul's residence, for disposition. On April 29, 2022, the Warren County Juvenile Court entered a dispositional order committing Paul to the custody of the Ohio Department of Youth Services for institutionalization in a secure facility for an indefinite term of at least one year.

{¶ 6} Paul appealed.

## II. Analysis

{¶ 7} Paul's sole assignment of error alleges:

> THE TRIAL COURT ERRED IN ADJUDICATING [PAUL] TO BE A DELINQUENT CHILD BY REASON OF RAPE BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THAT FINDING.

{¶ 8} Paul does not dispute that he engaged in anal intercourse with Charles or even that he compelled Charles to do so. But Paul contends that he did not "force" Charles and that there was insufficient evidence to prove that he had.

{¶ 9} In a delinquency adjudication, the standard of review for a sufficiency challenge is the same as the familiar standard for felony defendants. *See In re T.W.*, 8th Dist. No. 106231, 2018-Ohio-3275, 112 N.E.3d 527, ¶ 17. The reviewing court asks whether "'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 10} In this case, "it is worth remembering what is not part of the court's role when conducting a sufficiency review." *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, ¶ 16. "[A]n appellate court's role is limited." *Id*. It is the trier of fact's job to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *McFarland* at ¶ 24, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99

- 3 -

S.Ct. 2781 (1979). Accordingly, an appellate court "does not ask whether the evidence should be believed or assess the evidence's 'credibility or effect in inducing belief.' Instead, it asks whether the evidence against a defendant, if believed, supports the conviction." (Citation omitted.) *Jones* at ¶ 16, quoting *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 11} Paul was found to have committed rape under R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Force is the element at issue here. "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "[T]he [rape] statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327 (1998). But "'"force need not be overt and physically brutal."'" *Id*., quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988), quoting *State v. Fowler*, 27 Ohio App. 3d 149, 154 (8th Dist.1985). Furthermore, "'it is well settled that the testimony of a rape victim, if believed, is sufficient to support each element of rape.'" *State v. Woodward*, 12th Dist. Butler No. CA2011-02-036, 2011-Ohio-6019, ¶ 23, quoting *State v. Reinhardt*, 10th Dist. Franklin No. 04AP-116, 2004 Ohio 6443, ¶ 29; *see also State v. Dyer*, 2d Dist. Montgomery No. 28671, 2021-Ohio-2329, ¶ 20 (stating the same).

{¶ 12} Here, there is no evidence that Paul *threatened* physical force. Indeed, Charles expressly testified that Paul never threatened him. So the question is whether, based on the evidence, a rational trier of fact could have found that Paul "physically exerted" "violence, compulsion, or constraint" against Charles to compel him to engage in anal intercourse. R.C. 2901.01(A)(1), (2).

{¶ 13} When Charles came to live at the youth home, Paul was already living there,

- 4 -

and they began sharing a bedroom. Satterwhite, the youth home supervisor, testified that when Charles arrived, he would not always use a bathroom, that he "was using the bathroom on hi[m]self," causing him to smell, and that the other kids "used to tease him and talk about him and everything." Satterwhite and others at the youth home worked with Charles until he started using a bathroom and no longer smelled. The teasing stopped, and Charles became friends with Paul. According to Satterwhite, Charles "started relying on him [Paul], trying to build a friendship with the boys that w[ere] in the group home." Charles wanted to please the other boys, said Satterwhite: "they asked [Charles] to do things and [Charles] will do it, because [Charles] just wanted that friendship." In his testimony, Charles too said that he and Paul were friends, that they would "play outside" together and "[t]ake walks or ride bikes." They would also engage in sexual activity. Charles said that Paul would ask him to fellate him (Paul) and that he (Charles) would do so, albeit reluctantly because he did not really want to. Charles testified that on one occasion he thought that Paul had forced him by holding his head down in his lap.

{¶ 14} The sexual activity continued until one evening behind the shed outside the youth home Paul compelled Charles to engage in anal intercourse. Satterwhite testified that on that evening, on one of the home's exterior video cameras, he saw and heard Charles and Paul talking outside the home. He heard Charles tell Paul, "no, I'm not gonna do it, because I gave you oral sex twice already." Satterwhite then heard Paul mumble, "but I want you, and I want you now." Satterwhite went outside to see what was going on and as he walked towards the back of the house, he heard voices behind the shed. "[B]y the time I got behind the shed," said Satterwhite, "I seen [sic] * * * [Charles] bent over, [Paul] behind him, and [Paul] was thrusting inside of him." Satterwhite asked them what they were doing. "[A]s soon as they realized I was there, [Paul] got up, talking about he [Charles] made me do it, he made me do it. He lying, he lying, but he made me do it. [sic]" According

to Satterwhite, Charles, looking scared, voice "trembling," sounding "upset and hurt," said multiple times that "he [Paul] made me do it" and that "he [Charles] didn't want to do it."

{¶ 15} Charles described what happened behind the shed this way:

A. Me and [Paul] would—[Paul] was out in the yard and he called me to go behind the shed.

* * *

A. And he—he made me pull my pants down and stick his private up my butt.

Q. Okay. Is that something you wanted to do?

A. No.

Q. Why did you do it?

A. I think I was forced to, to my understanding.

Q. Okay. How were you forced?

A. By him holding my legs.

Q. How was he holding your legs?

A. Just moving, hovering over me type thing. Just hovering over me.

Q. Okay. Did [Paul] touch you at all that night?

A. * * *

A. He touched my legs, but that was it.

Q. How did he touch your legs?

A. Just holding them.

Q. Okay. Is that something you wanted him to do?

A. No, I didn't.

Q. Okay.

A. To be the truth.

Q. So what did he do after he touched your legs?

A. He just sucked [sic] the private area behind and it went from there.

* * *

Q. Okay. Did you try to get him to stop?

A. Yes.

* * *

Q. Did he stop?

A. No. I told him I don't want [to] do it, but he keeps asking me at that time.

Later, Charles said:

A. * * * It was forced on me.

Q. Because he kept asking you to do it?

A. Yeah.

Charles also testified that, during an interview a couple of weeks later, at Cincinnati Children's Hospital's Mayerson Center, he told the interviewer the same thing:

Q. At one point he [Paul] told you that if you did that that he would kiss you. You went behind the shed with him because he asked you to do that, right?

A. Yeah.

Q. You had sex with him because he asked you to do that, right?

A. Yep.

Q. I think you said before you didn't want to do it but he convinced you to?

A. Yeah.

Q. By asking and asking?

A. Uh-huh.

- 7 -

{¶ 16} Based on this testimony, both the magistrate and, independently, the juvenile court found the evidence sufficient to prove the elements of rape with regard to the anal intercourse incident behind the shed. Viewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable trier of fact could have concluded that Paul exerted physical compulsion or constraint upon or against Charles to compel him to engage in anal intercourse, as required for a rape conviction under R.C. 2907.02(A)(1), (2). A reasonable trier of fact could have reached this conclusion based on Charles's testimony that Paul had "made me pull my pants down and stick his private up my butt," Charles's testimony that he tried to get Paul to stop and that he told Paul he did not want to "do it," Charles's testimony that Paul did not stop despite Charles's efforts to make him stop, and, critically, Charles's testimony that Paul "forced" Charles by "holding my legs." A reasonable factfinder could conclude, based on this testimony, that the physical force exerted by Paul in holding Charles's legs was more than the force necessary to engage in the act of anal intercourse itself.

{¶ 17} We recognize that this is a difficult case, and that a reasonable trier of fact reviewing the evidence could, in the alternative, have concluded that Paul did not use physical force to compel Charles to engage in anal intercourse but rather that Paul made a request of Charles, badgered him about it, and Charles ultimately—and voluntarily—acceded. Such a trier of fact could have doubted Charles's testimony that Paul forced him to engage in anal intercourse by holding his legs, and could have instead concluded, as Paul argues on appeal, that Satterwhite observed Paul using no more force than that necessary to engage in the act of anal intercourse itself. This is essentially the view of the facts taken by our dissenting colleague.

{¶ 18} But we respectfully disagree with our dissenting colleague's approach

because the sufficiency standard that we apply "does not permit a court to make its own subjective determination of guilt or innocence," nor does it "require scrutiny of the reasoning process actually used by the factfinder." *Jackson*, 443 U.S. 307, at 319, fn. 13. "[T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) (Citation omitted.) *Id.* at 318-319, quoting *Woodby v. INS*, 385 U.S. 276, 282, 87 S.Ct. 483 (1966). In this case, we think that the evidence is such that a reasonable trier of fact could conclude that Paul used physical force to compel Charles to submit to anal intercourse and thus could find Paul guilty of rape. Specifically, as previously stated, we believe that a reasonable trier of fact could reach this conclusion based on Charles's testimony that Paul had "made me pull my pants down and stick his private up my butt," that Charles told Paul he did not want to "do it" and yet Paul did not stop, and that Paul "forced" Charles by "holding my legs." That Charles's testimony and the testimony of other witnesses described by our dissenting colleague could be viewed in a different light—a light not favorable to the prosecution—does not change our conclusion that when it is viewed in the light most favorable to the prosecution, the evidence in this case was sufficient to prove all elements of the offense.[3] *Woodward*, 2011-Ohio-6019 at ¶ 23 (stating that the testimony of the rape victim is sufficient to support the elements of rape).

---

3. Our dissenting colleague faults us for not conducting a de novo review of the evidence. It is true that "[a] challenge to the sufficiency of the evidence is reviewed de novo." *State v. Liming*, 12th Dist. Clinton No. CA2022-01-001, 2023-Ohio-2817, ¶ 40, quoting *State v. Bertram*, Slip Opinion No. 2023-Ohio-1456, ¶ 8. But de novo review here does not mean that we simply reweigh the evidence and reach our own conclusion. Rather, in conducting a de novo review in the context of a sufficiency challenge, "[t]he relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus. That is what we have done here.

### III. Conclusion

{¶ 19} We conclude that the evidence is sufficient to find that Paul used force to compel Charles to engage in sexual conduct. Therefore the juvenile court did not err in adjudicating Paul delinquent. The sole assignment of error is overruled, and the court's judgment is affirmed.

HENDRICKSON, J., concurs.
PIPER, P.J., dissents.

**PIPER, P.J., dissenting.**

{¶ 20} With respect, my colleagues' opinion has "made" me reach a different conclusion and this dissent will briefly address why I am doing so. The consequence of the majority's holding is to eliminate the essential element of force in *any* allegation of rape. Unless a person puts another in fear, simply being convinced to have sex does not replace the essential element of force.

{¶ 21} The majority opinion fails to conduct a de novo review that should take place without a deferential underpinning. Their analysis also fails to employ valuable case law with insight relevant to the circumstances which we are not at liberty to ignore. Once a true de novo standard is applied in consideration of the pertinent case law, the record is absent evidence that Paul purposely used physical force to obtain Charles' participation in their ongoing, but inappropriate, sexual relationship. No evidence was produced that Charles submitted because of force. The evidence does not demonstrate criminal intent.

{¶ 22} Distasteful sexual behavior by immature teenagers must not taint appellate review in applying the rule of law—rather ours is to guard and apply the fullest measure of the law without regard for the outcome. The consequences of an unsupported rape

adjudication are too lasting and severe, and ODYS must not become our wasteland for unwanted, difficult teenage boys. While psychological pressure, *in certain limited relationships*, may satisfy the element of *physical* compulsion, this is not one of those relationships.

ILL-FATED, INAPPROPRIATE FRIENDSHIP

{¶ 23} The two adolescent boys were legally placed in a group home for boys at different times. Behavioral issues often prohibit placement in the more routine environments, such as with relatives or foster homes. Group home placement for teenagers is often a last resort and extremely taxing on the staff because it is difficult to manage and supervise developing teenagers. Many of these teenagers have been psychologically damaged and come with present low self-esteem and developmental issues.

{¶ 24} In the circumstances presented, Paul, age fourteen, pursued a desire for sexual interaction while in a friendship with Charles, age fifteen. Charles sought acceptance and companionship by engaging in sex with his friend, Paul. They took walks, rode bikes, and would sit together—they were also "roomies." According to Charles, the alleged victim, they are still friends even after authorities filed a number of criminal charges against Paul. Testimony reveals Charles never considered Paul a villain.

{¶ 25} Circumstantial evidence establishes both boys knew their sexual interactions with one another could get them in trouble. They were able to hide their inappropriate sexual activities from the group home's staff. It is reasonable to expect that two young boys may feel shame, embarrassment, or guilt after being caught having sex with one another. Not unexpectedly, the very moment they got caught by an authority figure, each attempted to avoid being in trouble by blaming the other—inappropriate and immature, yes; forceful and criminal, no.

{¶ 26} It is not surprising the supervisor, Pops, projected his own emotions when he

interpreted Charles as being upset, looking scared, and with a trembling voice. Paul, the alleged delinquent offender, was also distraught and immediately blamed Charles. Charles, the alleged victim, in return tried to blame Paul. Charles' excited utterance blurted out to Pops was, "He *wanted* me to do it!" It wasn't, he *made* me do it, or he *forced* me to do it, or even I *had* to do it![4] Charles found getting caught to be embarrassing. Pops testified he was also upset as well and emotionally "hurt" and later had trouble sleeping. The situation was understandably unnerving for all three. Charles knew Pops would disapprove and be saddened knowing such a relationship was ongoing. Charles anticipated Pops would be "hurt." In fact, Pops testified it made him feel "like a failure."

{¶ 27} When Charles was questioned why he never told anyone about his sexual relationship with Paul, Charles stated that he didn't want to get in trouble and he was concerned with Pops' feelings. An example of testimony on the subject would be:

A: I did not want to get in trouble.

Q: Because they might move you out of that placement if you got in trouble, right?

A: Yeah.

Q: Okay. And when Pops caught you, did you think you were gonna be in trouble?

A: Yeah. And I was afraid that it might hurt Pops. . . It was embarrassing.

{¶ 28} There were investigatory interviews with Charles, and authorities filed eight charges: six counts of rape and two counts of gross sexual imposition. Eventually there was trial preparation and testimony. Why six of the charges were dismissed before trial suggests there was insufficient support for the charges, yet Charles was available to testify

---

4. Excited utterances are admissible due to their inherent reliability. Evid.R. 803(2); *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493 ¶ 179 (where the statement was made close in time relating to a startling event).

to each of their sexual interactions. We do know that after Charles testified the court found one charge of rape insufficiently supported, dismissing the charge of rape dealing with fellatio. The juvenile court dismissed the fellatio charge even though Charles said he was "forced" (explained later herein).

{¶ 29} However, the juvenile court determined that for the one remaining charge, Paul purposely used force to compel Charles to have sex.[5] Yet testimony established Charles voluntarily walked to the shed and went behind it for the purpose of having sex with Paul. Paul induced Charles by promising to kiss him. Charles was asked why he pulled his pants down, once behind the shed. He answered that he "thought" he had an "understanding" that he was "forced." It was never elicited as to why or who caused Charles to come to that understanding. There was no testimony Charles was fearful or had reason to be fearful. Without any operative facts, the juvenile court imputed into Paul and Charles' relationship the element of physical force which was inferred from the mere possibility of psychological pressure by one friend upon another. An example of only some of the testimony disavowing any overwhelming psychological pressure would be:

> Q: At one point he told you that if you did that that he would kiss you. You went behind the shed with him because he asked you to do that, right?
>
> A: Yeah.

{¶ 30} Sometime after they were caught, Charles came to an understanding that he did not want to do the things he did. Even the juvenile court and my colleagues determined there was never any threat of force. Charles testified he was never threatened or hurt. There was no evidence of a reason to fear Paul. Charles' subsequent, bare conclusion he

---

5. Neither the magistrate nor the juvenile court referenced any physical compulsion. The juvenile court's decision, and the majority opinion as well, references the physical constraint as being the touching that occurred in the act of having sex itself. Considering the touching and the physical mechanics of having sex, as meeting the requirement of force to compel submission, is contrary to existing caselaw which will be addressed herein.

was "made" to do the things he did (under his own volition) is insufficient to establish Paul purposely used force to commit a rape.

{¶ 31} I could say "they made me write a dissent," but it would be unreasonable to impute any threat, fear, or physical compulsion. A sense of obligation can produce one to act; similarly, a commitment to a role or relationship can compel one to act. My colleagues reject the notion that the use of broad and general words require operative facts, and instead they hypothesize a meaning where none is displayed in the record.

{¶ 32} In attempting to explain how he was "made" to participate, Charles stated that: Paul kept asking, sucked the private area, and touched him and was holding his legs when having sex. Pops confirmed Paul was holding Charles' legs and waist while engaged in the act of intercourse. There was simply no force to make Charles go behind the shed with Paul. There was no force to have Charles pull down his pants and position himself bending over, and no force that compelled Charles to permit penetration into his rectum. The only contact or touching was the touching involved in the act of having sex, not in compulsion or constraint to force submission. There was simply no evidence produced that Paul ever used physical force to compel compliance or overcome Charles' will.[6]

{¶ 33} The majority isolates testimony from its context: Charles did say, "No, I don't want to," but it wasn't attached to any fear or physical compulsion. Charles didn't want to go have sex again because he had earlier performed fellatio for Paul. In other words, Charles didn't want to have *more* sex. Paul's response was to beg: "I need you," enticing Charles by saying, "I'll kiss you." Ultimately, Charles was willing to go behind the shed for the purposes of sex.

{¶ 34} In fact, even at the time of trial Charles still considered Paul a friend. When

---

6. The majority's characterization that my perspective seeks to reweigh the evidence is a misunderstanding of my analysis and the significance in applicable caselaw.

questioned by the prosecutor, this exchange took place:

> Q: Now when this all started off, you stated that you guys were friends; is that correct?
>
> A: Uh-Huh.
>
> Q: Did that ever change?
>
> A: No, not at all
>
> Q: Okay. You can continue.
>
> A: I don't think really that much, except for the second, the date part, but I think we had a good relationship together. I think *he did everything that I wanted to do* except for the date part.

(Emphasis added).

{¶ 35} "Date part" was where the prosecutor emphasized Paul was holding Charles' head for Charles to perform oral sex. That charge was later dismissed by the juvenile court because Charles later explained, holding his head was only to get the "rhythm right." In other words, the act was simply giving and receiving fellatio. Therefore the juvenile court dismissed the charge after placing all the testimony in context, even though Charles had testified he was "forced" to perform the act. The "force" was not a force used to compel.[7]

{¶ 36} Returning to the shed incident, Charles was asked,

> Q: You had sex with him because he asked you to do that, right?
>
> A: Yep.
>
> Q: I think you said before you didn't want to do it but that he convinced you to?
>
> A: Yeah.
>
> Q: By asking and asking?
>
> A: Un-huh.

---

7. Just as the juvenile court understood words could not be isolated in meaning and had to be placed in context, so too would the reasonable average mind.

{¶ 37} Charles also testified,

> A: Yeah, he never threatened me at all.
>
> Q: And did he hurt you either?
>
> A: Nope.

{¶ 38} One person repeatedly "asking" for sex may be annoying, but it doesn't equate to rape unless it's done in a threatening manner. The majority opinion notes Charles had a willingness to please people. Merely being "convinced" to continue a sexual relationship is not rape unless the victim is under the age of 13. R.C. 2907.02(A)(1)(b). Here the alleged victim, Charles, was 15 years old and appellant was 14 years old. Charles was in his mid-adolescence stage and Paul still in a stage of early adolescence. Both teenagers were in a transitional stage of physical and psychological development. Since the strict liability of "statutory rape" isn't applicable, the requirement of criminal intent cannot be ignored.

## DE NOVO REVIEW

{¶ 39} A challenge to the sufficiency of the evidence raises the question as to whether the evidence is legally sufficient to support the criminal charge as a matter of law. *State v. Liming,* 12th Dist. Clinton No. CA2022-01-001, 2023-Ohio-2817, ¶ 40, citing *State v. Clinton,* 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 165, and *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The evidence is reviewed de novo. *Liming* at ¶ 40, citing *State v. Bertram,* Slip Opinion No. 2023-Ohio-1456, ¶ 8. This means we independently review the evidence giving no deference to the trial court's determination. *State v. Baston,* 12th Dist. Clermont No. CA2019-12-100, 2021-Ohio-890 ¶ 13, quoting *State v. Laghaoui*, 12th Dist. Warren No. CA2017-06-098, 2018-Ohio-2261, ¶ 22, and *State v. Walker,* 10th Dist. Franklin No. 06 AP-810, 2007-Ohio-4666, ¶ 10.

{¶ 40} A sufficiency of the evidence argument requires we determine whether the state produced adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Howland,* 12th Dist. Fayette No. CA2006-08-035, 2008-Ohio-521, ¶ 30, citing *Thompkins* at 386. "In essence sufficiency is a test of adequacy." *Thompkins* at 386. "If the state fails to present sufficient evidence on every element of an offense, then convicting a defendant for that offense violates the defendant's right to due process of law." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 13, citing *Thompkins* at *386.* The test for adequacy requires a determination as to whether the state met its burden of production. *Liming* at ¶ 40.

{¶ 41} The relevant inquiry asks whether a rational trier of fact could have found that all the essential elements of the crime were proven beyond a reasonable doubt. *Howland* at ¶ 30, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Phrased differently,

> In deciding whether the evidence presented at trial was sufficient to support a criminal conviction, a court must "'determine whether such evidence, if believed, would *convince* the *average mind* of the defendant's guilt beyond a reasonable doubt.'"

*State v. Troisi*, 124 Ohio St.3d 404, 2010-Ohio-275, ¶ 7 (Emphasis added), quoting *In re Washington*, 81 Ohio St.3d 337, 339 (1998), and *Jenks* at paragraph two of the syllabus.

{¶ 42} The majority suggests our review does not permit scrutiny of conclusions reached from the evidence or determinations of the offender's guilt or innocence. However, if an element of the offense is not proved, an offender retains the presumption of innocence. Similarly, the suggestion that it is not our role to scrutinize the evidence is a misplaced suggestion in a de novo review. Our role entails scrutinizing whether the evidence exists in the first place. With no mention of a de novo review in their analysis, the majority inadvertently marginalizes our role in a de novo review. Their opinion suggests that it is left

- 17 -

to the juvenile court to determine what evidence exists. I find this to be an inadvertent distortion of an independent review

{¶ 43} We cannot skip lightly over evidence required but not produced. Despite the majority's depiction that Charles "took efforts to make him (Paul) stop," there is no testimony revealing any such "efforts" taken by Charles. Such an inference must reasonably flow from facts in evidence, and there are none. Charles talked about "letting it happen," not about being forced or taking efforts to prevent their sexual activity. The state was required to produce evidence that Paul purposely used physical force, beyond the act itself, which compelled Charles to submit sexually. Such evidence is nonexistent.

{¶ 44} Physical force cannot be imputed based upon a bare, conclusory assertion Charles was "made" to do it. This is particularly true when placed in context of their relative ages, their friendship, and their history of past sexual relations. Charles testified it happened more than once. However, being repeatedly "asked" or "convinced" by a partner to have sex does not replace the requirement of force. Any inferences must flow from operative facts other than from the act itself—not conclusive accusations or unsupported suggestions. Upon considering the ages of the two boys and the nature of their ongoing relationship, the average rational mind could not find Paul used physical force to rape Charles.[8]

{¶ 45} Pops testified about Paul holding Charles' legs when they were engaged in the act of intercourse. Charles also referenced Paul touching and holding his legs. However, to infer "force" to compel the act overcoming Charles' will, the majority interprets

---

8. In considering the totality of the circumstances, average rational minds would divorce themselves from any disgust in the act itself. Upon hearing an allegation that one forcibly sodomized another there is an unavoidable emotional reaction finding the allegation abhorrent. However, the lack of evidence as to physical force reveals much more at play—despite the leading questions and willingness of the alleged victim to please, no physical force, or fear of physical force, existed. This in turn leaves an Achilles' heel in the state's case. The boys' unfortunate relationship is disheartening, not criminal.

the holding of Charles' legs as a forceful restrain to gain compliance. No facts support such a proposition. Pops never saw Charles struggling or resisting and Charles never testified about trying to resist. Using the act itself as sufficient force is contrary to long standing caselaw.

CASE LAW ANALYSIS

{¶ 46} "[T]he statute requires that some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327 (1998). In *State v. Edinger*, 10th Dist. Franklin No. 05AP-31, 2006-Ohio-1527, ¶ 52, the court found that although the evidence was sufficient to support a conviction for a lesser sexual offense, "there was not sufficient evidence of force presented for reasonable minds to find the additional element of force." The force the statute requires is more than "'force necessary to facilitate the act' but force * * * sufficient to overcome the will of the victim." *State v. Biggs*, 5th Dist. Delaware No. 21 CAA 09 0048, 2022-Ohio-2481, ¶ 18, quoting *Eskridge*, 38 Ohio St.3d at 58-59, *State v. Torres,* 4th Dist. Scioto No. 21CA3951, 2023-Ohio-1406, ¶ 48. "As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Eskridge* at 59. Yet here, the act of having intercourse, much like the act of fellatio which was dismissed by the juvenile court, was the only force in evidence.

{¶ 47} In attempting to find a substitute for overt physical force, the majority opinion relies upon *Dye* and *State v. Fowler,* 27 Ohio App.3d 149 (8th Dist.1985). Yet neither case is truly applicable to the current circumstances. Both cases involve an adolescent under the control of an adult authority figure—one abuser a stepfather, the other an adult in loco parentis. The relationships involved the victims being obligated to obedience and compliance with the authority figure. The role of an authority figure involves an inherent power of punishment and retribution for noncompliance which creates a reasonable fear.

This fear "creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." *Dye* at 327, citing *Eskridge* at 59. Notably, as between Paul and Charles, there is no evidence of threats or displays of force.

{¶ 48} *Dye* is instructive however because it reminds us to examine such circumstances as the age, size, and strength differences, as well as the relationship between the parties. *Dye* at 328. The same degree of force and violence may not be required upon a person of tender years when abused by an adult as would be required where the parties are more equal in age, size, and strength. *Id.* at 326. "Ohio Supreme Court caselaw demonstrates that the type and amount of force necessary to purposefully compel a victim to submit by force * * * depends upon the victim and offender's relationship." *State v. Bradshaw*, 3d Dist. Logan No. 8-22-09, 2023-Ohio-1244, ¶ 51.

{¶ 49} The amount of force used must be beyond the force inherent in the crime itself. *Torres* at ¶ 48, citing *Dye*, 82 Ohio St.3d at 327. In order to qualify sufficient physical force it must be such that it is the factor that overcame the victim's will. *Id.* at ¶ 52. For conduct to rise to the level of physical force it must create a reasonable belief or fear that physical force will be used if the victim does not consent. *State v. Boyd,* 7th Dist. Mahoning No. 20 MA 0131, 2022-Ohio-3523, ¶ 58, citing *State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734 ¶ 42. Absent here is that Charles never had a fear of his friend, Paul. In fact, Charles kept their sexual relationship secret because he didn't want to be moved out of the group home for boys.

{¶ 50} *Dye* explained that in *State v. Schaim*, 65 Ohio St.3d 51 (1992), the Ohio Supreme Court determined that where the alleged victim was an adult, no longer in her father's household, the earlier pattern of incest was no substitute for the element of force. The state needed to introduce evidence that an adult victim believed that the defendant

might use physical force against her. *Dye* at ¶ 327, citing *Eskridge*, 38 Ohio St.3d at paragraph one of the syllabus. In other words, the nature of the relationship is a crucial consideration before the law finds physical force can be imputed into the relationship. As an adult no longer living in her father's household, the victim no longer had reason to fear her father.

{¶ 51} In the circumstances presently being considered, there is no evidence of force beyond the act itself. There also is no evidence of a threat of force. Charles gave no reason to fear Paul. The evidence does not support imputing force into Paul and Charles' relationship, as in *Schaim,* the details of their relationship become significant.

CONCLUSION

{¶ 52} Begging for sex or offering to exchange kisses for intercourse is not a substitute for the element of physical force, particularly when sex is part of a mutual friendship between immature, displaced teenagers of similar age, each with similar needs. Being weak in compliance is not the same as being compelled by fear. Regardless of our disapproval for the boys' conduct, where one was greedy for sex and the other for companionship and an unguarded willingness to please, neither the law nor the evidence permits imputing physical force into their friendship. This charge of rape should have joined the other seven charges and been dismissed.

{¶ 53} I would vacate the adjudication based upon this charge of rape and discharge Paul from his adjudication to be released from ODYS, unless being held on other matters.