[Cite as *State v. Helvey*, 2022-Ohio-98.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-01-008 |
| | : | O P I N I O N |
| - vs - | | 1/18/2022 |
| | : | |
| TAVON LAMAR HELVEY, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2020-03-0498

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Andrew Karas, for appellant.

**BYRNE, J.**

{¶1} Tavon Lamar Helvey appeals his convictions in the Butler County Common Pleas Court for multiple firearm-related offenses. For the reasons that follow, we affirm Helvey's convictions.

## I. Facts and Procedural History

{¶2} In June 2020, a Butler County grand jury indicted Helvey on one count each

of discharging a firearm on or near prohibited premises, felonious assault, weapons under disability, and improperly handling firearms in a motor vehicle. The indictments stemmed from allegations that Helvey, a convicted felon, was a passenger in a vehicle that was chasing another vehicle at high speed through Middletown, and that Helvey emerged from the vehicle's sunroof and began shooting a firearm at the other vehicle.

{¶3} The matter proceeded to a jury trial. Ronald and Florence Globke testified that on October 25th, 2019, they were traveling in their vehicle in Middletown and were at the intersection of Grand Avenue, The Alameda[1], and Sutphin Street when they observed a sport utility vehicle (SUV) traveling at a high rate of speed. They then saw a sedan following the SUV, also at a high rate of speed. According to Mr. Globke, it appeared that the sedan was chasing the SUV.

{¶4} Both Globkes testified to observing a person emerge through the sedan's sunroof with a gun and then fire several shots towards the SUV. The Globkes also observed a black hat fly off the shooter's head. The Globkes drove over to the hat and parked in front of it. Mr. Globke explained that he thought the hat would be important and wanted to make sure that no one drove over the hat. Mrs. Globke then called 9-1-1 and the Globkes waited for police to arrive.

{¶5} Amy Vitori testified that she was outside her home on Grand Avenue and Highland Street when she saw two vehicles "racing" up Sutphin Street. The first vehicle was either a minivan or an SUV, but the second vehicle was a sedan. There was an individual outside of the sedan's sunroof who had a gun and was firing at the vehicle ahead. Vitori testified that she "was focused on his face and the weapon." The shooter was an African American, in his twenties, wearing a black windbreaker. He had "a clean, like,

---

1 "The Alameda" is a street in Middletown.

shorter haircut." He also had "the kind of beard along the jawline." He was not heavyset, but rather he had a "normal, maybe slightly slender build." The gun was a handgun, and she was "pretty sure" it was silver. The shooter was holding the gun with a "typical grip" on the handle. She thought she saw something fly off the back of the vehicle that could have been a hat. Vitori testified that Helvey, whom she observed in the courtroom, looked "very similar" to the individual she observed.

{¶6} On direct examination, Vitori testified that the individual was a "darker skinned" African American. On cross examination, defense counsel confronted Vitori on her description of the shooter's skin color, asking whether she had seen a "dark skinned" African American. Vitori responded that the skin color she observed was "medium." On re-direct, she clarified that on the spectrum of very dark skinned to very light skinned African Americans, this individual was "medium." She further clarified that Helvey's skin color, observed in the courtroom, was "consistent" with what she observed when she saw the shooter on October 25, 2019.

{¶7} Police officers testified as to their procedures in recovering the hat and arranging for it to be transported to the Ohio Bureau of Criminal Investigation ("BCI") for forensic DNA testing.

{¶8} A police detective testified that in 2015, Helvey was the suspect in a burglary. In the context of investigating that crime, the detective secured a search warrant and obtained a DNA or buccal swab from Helvey.

{¶9} Logan Schepeler, a forensic scientist at BCI, testified that he analyzed the DNA swab taken from the black hat. The analyst who took the swab had swabbed the entire inside rim of the hat. Schepeler found that the swab contained a mixture of four DNA profiles. There was one major contributor, which constituted an estimated 90 percent of the DNA on the swab. The other three contributors were so "minute" that they could not be

analyzed. Schepeler believed that the amount of DNA recovered on the hat would indicate that the major DNA profile would be associated with the person who wore the hat more often than anyone else.

{¶10} Schepeler compared the major profile to Helvey's known DNA standard and determined it was a match. Schepeler estimated how rare the match would be in the general population of unrelated individuals and determined it would be rarer than one in one trillion individuals. On cross-examination, Schepeler admitted that the DNA evidence did not reveal who among the four DNA sources last wore the hat.

{¶11} The defense rested without submitting evidence. During deliberations, jurors sent a note to the court. The note indicated that one juror had made a comment about having seen Helvey "around town," enough to be familiar with his demeanor. The note asked whether this might prevent Helvey from receiving a fair and impartial trial.

{¶12} The court thereafter questioned the juror who said he had seen Helvey "around town." The juror clarified that he had seen Helvey but did not know him and that he had been replying to another juror's comment as to Helvey's demeanor during the trial. The juror assured the court that he could decide the case fairly and impartially. The court then individually questioned all of the remaining jurors about what occurred and whether the juror's remark affected their ability to decide the case fairly and impartially. All jurors agreed that they could decide the case fairly and impartially.

{¶13} After the court finished interviewing the jurors, Helvey moved for a mistrial. The court denied the request. Following deliberations, the jury found Helvey guilty of all counts of the indictment. Helvey was sentenced to a prison term. Helvey appealed, assigning two errors for our review.

## II. Law and Analysis

{¶14} Assignment of Error No. 1:

{¶15} THE TRIAL COURT ERRED IN DENYING MR. HELVEY'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO OHIO R. CRIM. P. 29.

{¶16} Helvey contends that the trial court erred in denying his Crim.R. 29 motion for acquittal because the state submitted legally insufficient evidence to convict him of all the offenses. Specifically, Helvey contends that the state submitted insufficient evidence to allow a rational finder of fact to conclude that the state proved his identity.

## A. Standard of Review

{¶17} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the-evidence claim. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

{¶18} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "Sufficiency of the evidence is a question of law, and the appellate court must be careful in its evaluation of

- 5 -

the evidence not to substitute its own judgment of witnesses' credibility for that of the trier of fact." *State v. Eacholes*, 12th Dist. Butler No. CA2013-11-195, 2014-Ohio-3993, ¶ 29.

## B. Sufficiency of the Evidence Supporting Proof of Identity

{¶19} The state is required to prove a perpetrator's identity beyond a reasonable doubt. *State v. Cook*, 65 Ohio St.3d 516, 526 (1992). After viewing the evidence in a light most favorable to the prosecution, we find that a reasonable jury could find that the state established Helvey's identity beyond a reasonable doubt. Specifically, it was undisputed that the shooter was wearing a hat on his head, that the hat fell off, that the inside brim of the entire hat was swabbed, and the resulting swab tested positive for four DNA profiles. Although the hat contained DNA from multiple sources, there was only one major profile, which contributed 90 percent of the DNA found. The remaining three sources were so "minute" that they could not be tested. The major profile was a DNA match to Helvey and the statistical chances that it could be a match to any other person were approximately one in a trillion—that is, so unlikely as to be disregarded.

{¶20} In addition to the DNA match evidence, Vitori testified that Helvey looked "very similar" to the person she saw firing the gun. In this regard, Vitori testified that, during the event, she was "really focused" on the shooter's face, and she supported this testimony by providing a significant amount of detail about the shooter: his approximate age (20s), his race (African American), his hair ("a clean, like, shorter haircut), and his facial hair ("the kind of beard along the jawline"). She also noticed that the shooter was wearing a black windbreaker, which she said was blowing in the wind but was "pretty fitted" so the blowing fabric did not obscure the shooter's body shape or size. Vitori noted that the shooter was not heavyset, but had a "normal, maybe slightly slender build." Vitori further testified that Helvey's skin color was consistent with the shooter's skin color. To the extent Vitori was inconsistent about her description of skin color, this issue was thoroughly examined at trial

by both sides and goes to the weight to be attributed to Vitori's testimony, not to the sufficiency of the evidence. *See In re Pugh*, 12th Dist. Clermont No. CA2000-01-010, 2000 WL 1843220, *3 (Dec. 18, 2000) (inconsistencies in in a witness' statements and testimony were matters of credibility not relevant to a sufficiency of the evidence review). Helvey did not bring an assignment of error regarding the weight of the evidence.

{¶21} The DNA evidence, when considered alongside Vitori's testimony concerning Helvey's appearance, was sufficient evidence to establish identity. And while some evidence submitted to establish Helvey's identity was circumstantial, circumstantial evidence has no less probative value than direct evidence. *State v. Gragg*, 173 Ohio App.3d 270, 2007-Ohio-4731, ¶ 17 (12th Dist.).

{¶22} Helvey cites two cases from the Tenth and Eighth District Courts of Appeal for the proposition that in a firearms prosecution, where no eyewitnesses physically observed the defendant firing a weapon, a verdict can only be sustained if the defendant is positively identified carrying a gun either moments before or after gunshots are heard. *State v. Whiteside*, 10th Dist. Franklin No. 08AP-602, 2009-Ohio-1893, ¶ 31; *State v. Jones*, 8th Dist. Cuyahoga No. 108371, 2020-Ohio-3367, ¶ 73-74. However, neither case stands for the bright-line proposition argued by Helvey. Helvey's argument is essentially that those cases presented more evidence connecting the defendant to the crime than presented here. But this argument also goes to the weight of the evidence, not its sufficiency.

{¶23} Helvey also argues that the state's DNA evidence was insufficient because the hat swab tested positive for three other sources of DNA and because Schepeler admitted on cross-examination that the prevalence of Helvey's DNA on the hat did not "speak to the crucial temporal issue of which one of those four persons had most recently worn the hat." The fact that the hat returned other sources of DNA and that the DNA evidence could not precisely establish who last wore the hat are, again, arguments that go

to the weight of the DNA evidence presented, not its sufficiency. The jurors in this case could, and likely did, weigh the fact of three other sources of DNA against the evidence showing that 90 percent of the DNA collected matched Helvey's and that the remaining sources of DNA were so minute as to be incapable of analysis.

{¶24} Finally, in his reply brief, and citing *State v. Buckner*, 5th Dist. Richland No. 2016 CA 101, 2018-Ohio-233, Helvey claims that when circumstantial evidence is the only evidence relied upon by the state to prove an element of an offense, then circumstantial evidence is insufficient as a matter of law unless it precludes all reasonable theories of innocence. However, the Ohio Supreme Court has rejected that approach to the evaluation of the sufficiency of circumstantial evidence, holding:

> Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. *Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt.* We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder.

(Emphasis added.) *Jenks*, 61 Ohio St.3d at 272.

{¶25} Viewing the evidence in a light most favorable to the prosecution—as we are required to do when presented with a challenge to the sufficiency of the evidence, *Jenks* at paragraph two of the syllabus—we conclude that the state presented sufficient evidence to permit the jury to find that the state established Helvey's identity. We therefore overrule Helvey's first assignment of error.

{¶26} Assignment of Error No. 2:

- 8 -

{¶27} THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A MISTRIAL.

{¶28} Helvey next argues that the trial court erred in failing to grant a mistrial where, during deliberations, a juror shared with other jurors that he had seen Helvey outside of the courtroom and commented on Helvey's demeanor.

### C. Factual Summary of the Juror Issue

{¶29} During deliberations, jurors forwarded the following note to the court:

> Juror said during deliberations that he had seen the Defendant around town enough to make an assumption about his disposition. We want to check with the Court as to whether this might prevent a fair and impartial trial.

The jury foreperson subsequently identified Juror 575 as the juror in question. Juror 575 was then individually questioned by the court and counsel. Juror 575 explained that he had seen Helvey around Middletown but did not know him and had never spoken to him. He did not realize that he recognized Helvey until after the trial began, when he saw a woman in the audience who he recalled seeing with Helvey at Walmart.

{¶30} Juror 575 explained that his comment was prompted by another juror who had made a remark about Helvey's demeanor in the courtroom. Juror 575 had then replied that Helvey did not look any different to him than when he saw him at Walmart—that is, his facial expression was the same.

{¶31} When questioned, Juror 575 stated that the fact that he had seen Helvey before did not give him any impression about Helvey. Juror 575 further assured the court that he could be fair and impartial in his deliberations and would follow the court's instructions regarding the law. The prosecutor asked Juror 575 whether the statements he made about Helvey would prevent him and other jurors from continuing their deliberations, and Juror 575 stated it would not.

{¶32} The court then decided to individually question all of the jurors concerning Juror 575's remark. The jurors each relayed to the court their recollection of the conversation. One juror recalled that someone "had brought up the Defendant's demeanor." Another juror remembered someone mentioning that Helvey had appeared "fairly unemotional " during the trial. Another juror recalled that "[i]t was brought up that the Defendant was very stoic throughout the trial."

{¶33} According to one juror, Juror 575 then responded by stating, "well, he's always like that." Another juror recalled Juror 575 having said that Helvey "looks like that all the time." Another Juror related that Juror 575 said that he looked that way when he had previously seen him. And another juror stated that Juror 575 said he had seen Helvey and his girlfriend several times around Middletown, specifically at Walmart.

{¶34} A juror explained that when he heard Juror 575's remarks, it made him concerned that Helvey might not receive a fair trial because, "I just felt that how [Juror 575] jumped up and presented himself as that he felt like he knew how the Defendant acted outside the courtroom, it could allude to a character or how he presents himself."

{¶35} The jury foreperson explained that when Juror 575 made his remarks about Helvey's demeanor, there were a few jurors who had concerns and that "there was a couple of us just wanted to make sure that everybody was aware of the situation and had a chance to just make sure that things were on the up-and-up and that there -- we -- my biggest thing is just making sure, especially reading through the jury instructions, that we were in fact a fair and impartial jury."

{¶36} All of the jurors, without reservation, assured the court that, notwithstanding Juror 575's remarks, they could decide the case fairly and impartially. After the jurors were sent back, defense counsel explained that he was concerned "with the fact that we have a juror who * * * had some impression of Mr. Helvey outside of the four corners of this room *

- 10 -

* *." Counsel subsequently moved for a mistrial. In denying the motion, the trial court explained

> when I received this note, I was concerned as well. I want to make sure that this is a fair and impartial trial. And I was particularly concerned about the language, "enough to make an assumption about his disposition." But now that that's been fleshed out a little bit more, I feel less concerned about that.

## D. Standard of Review

{¶37}   A trial court must declare a mistrial only "when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Pursuant to Crim.R. 33, a new trial may be granted for any "irregularity in the proceedings * * * because of which the defendant was prevented from having a fair trial" or due to "misconduct of the jury."

{¶38}   Trial courts have broad discretion in deciding whether to grant a mistrial. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92. Therefore, an appellate court reviews an order denying a motion for a mistrial for abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). To show an abuse of discretion, the defendant must demonstrate material prejudice. *State v. Adams*, 144 Ohio St. 3d 429, 2015-Ohio-3954, ¶ 198.

## E. Whether the Court Erred in Failing to Grant a Mistrial

{¶39}   Based upon careful consideration of the record, we conclude that a fair trial was possible, and therefore Helvey had not demonstrated material prejudice. The comment by Juror 575 as to Helvey's demeanor was, at worst, neutral. Juror 575's comment implied nothing about Helvey's character other than he has an unemotional demeanor or facial expression. At best, the remark could be perceived positively. The statement that Helvey was "always like that" could communicate to other jurors that Helvey's unemotional demeanor was normal for him and thus reinforce the fact that Helvey's disposition in the courtroom was irrelevant.

{¶40} Every single juror, including Juror 575, reaffirmed that, notwithstanding what occurred, they could decide the case fairly and impartially. The fact that several jurors felt it necessary to bring this matter to the court's attention strongly indicated that this was a conscientious jury that took seriously the importance of deciding the case fairly and impartially. As specifically stated in the question sent to the court, the jurors simply sought assurance that what occurred during deliberations would not "prevent a fair and impartial trial."

{¶41} Finally, the court provided the jurors with a curative instruction:

> I want to thank you for bringing to my attention the concern that you had. And I would ask that if you have any concerns about anything else as we proceed through these deliberations, that you continue to bring them to my attention. That is the right thing to do, and we all want to make sure this is a fair and impartial jury.
>
> So what I'm going to instruct you is that, again, you are not to consider anything that is not in evidence. So only the exhibits that you have received and the testimony on the stand is what you can consider. So anything else that has been said to you, I'm ordering you to disregard it and to have no further discussion about it in your deliberations.

We presume that the jury followed the trial court's instructions and only considered the evidence properly presented at trial. *See State v. Smith*, 12th Dist. Fayette No. CA2006-08-030, 2009-Ohio-197, ¶ 39, 59.

{¶42} Helvey nonetheless argues that Juror 575's remarks caused jurors to be tainted by an outside influence. In support, he cites *State v. Scott*, 8th Dist. Cuyahoga No. 53120, 1988 WL 132574 (Dec. 9, 1988). In *Scott*, the Eighth District Court of Appeals affirmed a conviction for aggravated murder but reversed a death penalty sentence because certain jurors had seen a newspaper article discussing the defendant's previous death sentence conviction. The basis for reversal was that the previous death sentence was an unindicted aggravating factor, and the court could not say that the jury's exposure to this

information had not factored in the defendant's death sentence. *Id.* at *8. The admission of an inadmissible prior death sentence conviction in a death penalty case cannot be compared to a largely benign comment on a defendant's demeanor or facial expression. *Scott* does not persuade us that we should not presume that the jury followed the trial court's instructions and instead only considered evidence properly presented at trial.

{¶43} Based on the foregoing, we find that Helvey failed to demonstrate that a fair trial was no longer possible and therefore failed to demonstrate material prejudice. Accordingly, we find that the trial court did not abuse its discretion. We therefore overrule Helvey's second assignment of error.

{¶44} Judgment affirmed.

PIPER, P.J., and M. POWELL, J., concur.