[Cite as *State v. Willis*, 2024-Ohio-2210.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2023-07-060 |
| | : | O P I N I O N |
| - vs - | | 6/10/2024 |
| | : | |
| DARIUS DEANDRE WILLIS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 22CR39468

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Timothy J. McKenna, for appellant.

**BYRNE, J.**

{¶ 1} Darius Deandre Willis appeals from his convictions for aggravated burglary, aggravated robbery, and robbery in the Warren County Court of Common Pleas. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

{¶ 2} In July 2022, a Warren County grand jury returned a 15-count indictment charging Willis with two counts of aggravated burglary, five counts of aggravated robbery, five counts of robbery, one count of petty theft, and two counts of failure to comply with an order of a police officer. The aggravated burglary, aggravated robbery, and robbery offenses all included firearm and forfeiture specifications.

{¶ 3} The indictment arose after Willis was alleged to have been involved in an armed home invasion in Warren County on June 12, 2022. It was alleged that Willis entered the home with two accomplices, stole items from the victims, and then drove the get-away vehicle, which was pursued by responding law enforcement. It was also alleged that Willis and the two accomplices abandoned the vehicle and fled on foot. Soon after, Willis was arrested while hiding under the deck of a nearby residence.

{¶ 4} The matter proceeded to a jury trial in July 2023. The state presented the following testimony.

### A. State's Evidence

### 1. Crystal Mansfield's Testimony

{¶ 5} Crystal Mansfield testified that she lived at 84 Shadow Lake, located in Mason, Ohio ("the home"). The home was a three-bedroom trailer. Crystal lived at the home with her boyfriend William Hamlin and their three children, "Blake," "Carson," and "Henry."[1] Crystal testified that, as of the date of the trial, Blake was 11 years old, Clayton was eight years old, and Hayden was one year old.

{¶ 6} Crystal recalled the events of June 12, 2022. She testified that on that day

---

1. Rather than using initials, we are using pseudonyms to refer to the minor victims, to protect their privacy and for purposes of readability. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1. *See also* Ohio Constitution, Article I, Section 10a(A)(1) (requiring that victims in the criminal and juvenile justice systems "be treated with fairness and respect for the victim's safety, dignity and *privacy*"). (Emphasis added.)

she was at the home with the three children and William's mother, Lena. Just before 5:00 p.m., she was sitting in the home's kitchen with Lena. Blake was in a bedroom playing video games. Carson was in the living room, also playing a video game. Henry was taking a nap in a "backroom."

{¶ 7} Crystal testified that a man (we will refer to him as "Suspect 1") opened up the door to the home, leaned in (without entering) and said, "this is a robbery," in a "joking voice." Then, a different man ("Suspect 2") entered the home. Suspect 1 followed Suspect 2 inside the home. Both men were wearing masks. Suspect 2 was "more aggressive" than Suspect 1. After Suspect 2 entered the home, he said, "this is a robbery. Get on the ground." Suspect 2 had a gun and pointed the gun at Crystal and Lena.

{¶ 8} Crystal and Lena complied with Suspect 2's demands and laid down on the floor. Two seconds later, a third individual ("Suspect 3") entered the home. He said "get in the door" and William walked into the home. Then "they" (the three suspects, not William) started asking "where the money was."

{¶ 9} Crystal described Suspect 1 as a black male, "dark-skinned," tall, and skinny, with brown eyes. His hair was "full," meaning he needed a haircut. He was wearing something "dark on the top of him" and blue jeans. Suspect 1 was wearing a mask that was maybe black or blue. It was a "homemade" cloth mask "you can get at like Walmart." She did not see whether Suspect 1 had a gun.

{¶ 10} Crystal described Suspect 2 as a white male with "baby bluish" eyes. He had tattoos "all over him." He was wearing jeans, "maybe" a silver shirt, and a "hospital mask." She thought the gun he was holding was silver, but she was not really looking at it.

{¶ 11} Crystal described Suspect 3 as a black male, "dark-skinned," and as "a more built guy." He was wearing a hospital mask like Suspect 2.

{¶ 12} Crystal stated that Carson observed the men with guns and ran to the home's door. "They" pointed guns at Carson and told him that they would shoot him if he opened the door. Carson started crying and Crystal called him over to her.

{¶ 13} Suspect 1 then went to Blake's bedroom and told him to lie down. Suspect 2 then told Crystal that he would shoot her in the leg if she did not give him "the money."

{¶ 14} Next, Suspect 1 and Suspect 3 took William to the "backroom." Suspect 2 remained with the rest of the family, with a gun pointed at them. In the backroom, Crystal heard the sounds of "them hitting on" William. Then William, Suspect 1, and Suspect 3 left the home. "They" (presumably William, Suspect 1, and Suspect 3) then returned to the home. The three suspects began rifling through the home looking for items to steal. The suspects took Crystal's black nail bag, her pair of Nike shoes, her medical marijuana, and William's phone and keys.

{¶ 15} All three suspects then left the home. After the suspects left, Crystal ran to a neighbor's house and called 9-1-1.

{¶ 16} Crystal did not see any of the suspects' faces because they were wearing masks. She did not know who any of the suspects were and had no idea why they would choose to rob the home.

## 2. William Hamlin's Testimony

{¶ 17} William Hamlin testified that on June 12, 2022, he was working at his restaurant job. He left work and travelled home, arriving at about 4:30 p.m. When he arrived, he observed a red Buick SUV outside the home that he did not recognize. He also saw two people he did not recognize running into the home.

{¶ 18} William parked his vehicle and then went onto the home's porch. Then a man jumped out of the SUV and came up behind him. The man told him to get inside the home and get on the floor. The man was armed with a "regular little small handgun."

William believed it was a black handgun. This suspect was "light-skinned" and was wearing a top with a hood and a green mask.

{¶ 19} Once inside the home, William observed that all three suspects had guns. One was tall and skinny, and "real dark-skinned." One was of medium height, skinny, and "dark-skinned." The third was "light-skinned" and had a "little gut" and was covered in tattoos. All three suspects wore dark clothing. The "light-skinned" suspect had grayish blue jeans.

{¶ 20} The tall suspect checked William's pockets and asked for his car keys. This suspect was wearing a "regular COVID mask" and all black clothing, including black shoes. William noticed the shoes were black because this suspect, sometime in the home invasion, kicked him in the head.

{¶ 21} William testified that the suspects took him to his bedroom. They pointed a gun at him and demanded that he open a safe located in the room. The safe had $1,000 in it and some firearms. He refused to open the safe. Instead, he told the suspects that he had money in his pocket and money in his car.

{¶ 22} The suspects took William's phone, keys, and the money in his pocket. William's key was distinctive because it included a Bengals logo. One suspect went outside and checked William's car for money, but then returned and said there was no money in the car.

{¶ 23} When the suspects left the home, William watched as they fled in their red Buick SUV. He saw that there was no license plate on the vehicle.

### 3. Deputy Sheriff Billy Gantz's Testimony

{¶ 24} Deputy Sheriff Billy Gantz of the Warren County Sheriff's Office testified that he was on patrol in Warren County on June 12, 2022, not far from the home. He received a dispatch to the home. The report was that a burglary had occurred, and a family had

been held at gunpoint. As he was responding to the scene, he received a B.O.L.O., i.e., a "be on the lookout" notice, for a maroon Buick SUV.

{¶ 25} While responding to the scene, a maroon Buick SUV passed him. He turned around and gave chase. The vehicle began to elude him. The chase continued onto southbound interstate 75, where chase speeds ranged from 100 to 130 miles per hour.

{¶ 26} Deputy Gantz pursued the vehicle into Hamilton County, where it exited the highway at the Sharon Road exit. Deputy Gantz was not able to follow the vehicle onto the exit because he was blocked by other traffic on the highway.

{¶ 27} Deputy Gantz learned that the vehicle crashed shortly after exiting the highway at the intersection of Chester Road and East Sharon Road. He responded to the scene. Outside of the vehicle, at the rear passenger side, he located William's car key, with the distinctive Bengals logo.

### 4. Officer Zachary Jones' Testimony

{¶ 28} Officer Zachary Jones testified that he was a patrol officer with the Sharonville Police Department. On June 12, 2022, he was aware of the police chase headed towards his jurisdiction. He waited at the highway exit and observed a Buick SUV driving off the ramp and travelling on Sharon Road. He turned around and pursued the vehicle. The vehicle began to emit heavy smoke and he lost sight of it momentarily.

{¶ 29} Once Officer Jones cleared the smoke, he observed that the vehicle had left the roadway at the intersection of East Sharon Road and Chester Road. He observed three individuals flee from the vehicle.

{¶ 30} Officer Jones pursued the driver on foot. He called out the driver's description on the police radio while chasing him. Officer Jones testified that the driver was a black male, average height, not thin, not overweight. He was wearing a dark,

bluish, blackish jersey with the number 9 on it.

{¶ 31} As he was chasing the suspect, Officer Jones noticed the suspect digging into the front of his pants. Officer Jones believed that the suspect was attempting to retrieve a firearm. He continued to chase the suspect and retrieved his own firearm from its holster.

{¶ 32} The suspect then jumped a fence and Officer Jones lost sight of him at a tree line. Officer Jones stayed where he was and then, minutes later, was advised that a suspect matching the fleeing driver's description had been spotted by a nearby homeowner who had seen the suspect jumping their fence.

{¶ 33} Officer Jones went to that address, 10929 Chester Road. The suspect, Willis, was located hiding under the rear deck of the home. Officer Jones arrested Willis. He identified Willis as the driver of the vehicle and the person he chased. Willis was wearing the same jersey with the number 9 on it.

{¶ 34} Officer Jones testified that on June 13, 2022, the day after the home invasion, a firearm was located in the grassy area behind a residence located at 10979 Chester Road. This address corresponded to where Officer Jones lost sight of Willis when he went over a fence. The gun recovered was a small, purple pistol.

{¶ 35} The state played the dash camera footage from Officer Jones' vehicle as well as Officer Jones' body camera footage for the jury. The dash camera footage depicts three suspects running away from the vehicle in different directions. The person later identified by Officer Jones as Willis is shown running from the driver's side of the vehicle. A second suspect appears to be lighter-skinned and is wearing lighter-colored clothing. The third suspect appears to be wearing all black or dark clothing.

{¶ 36} The other two suspects were never apprehended or charged.

**5. Deputy Brian Hambrick's Testimony**

{¶ 37} Deputy Brian Hambrick testified that he worked for the Warren County Sheriff's Office and processed the Buick SUV for evidence. He photographed and collected into evidence various items of interest in the vehicle. On the floor of the rear passenger-side seat, there was a black bag containing various beauty supplies. In the same area, there was a white shoebox containing Nike shoes. There were also packets of medical marijuana.[2] On the rear driver's side seat, there was a dark blue jacket, with a green "camo" gaiter tucked inside the jacket.

### 6. Detective Brandon Abshear's Testimony

{¶ 38} Detective Brandon Abshear testified that he worked as an investigator for the Warren County Sheriff's Office. He testified as to the testing results on the evidence that was recovered. Multiple DNA mixtures were located on the firearm recovered behind the home near where Willis fled, but no DNA profile could be developed. The camo gaiter was tested and matched Willis' DNA profile.

{¶ 39} Willis presented no defense case.

### B. Verdict and Sentencing

{¶ 40} The jury found Willis guilty of the aggravated burglary, aggravated robbery, and robbery counts, as well as the specifications attached to those counts. The jury also found Willis guilty of petty theft. The jury found Willis not guilty of the two counts of failure to comply.

{¶ 41} After merging certain counts, the court sentenced Willis as follows. On Count 1 (aggravated burglary), the court ordered Willis to serve an indefinite term of four years to a maximum of six years, consecutive to a three-year firearm specification. On Count 3 (aggravated robbery), the court ordered Willis to serve a prison term of three

---

2. During Crystal's testimony, she reviewed photographs of these items and identified the items as the property stolen by the suspects.

years consecutive to a three-year term for the firearm specification. The court ran Counts 1 and 3 and their specifications consecutive to one another. The court imposed concurrent sentences on the remaining counts and specifications. In total, the court imposed an aggregate prison term of 13 to 15 years in prison. In doing so the court made consecutive sentence findings which will be discussed further below.

{¶ 42} Willis appealed and raised three assignments of error.

## II. Law and Analysis

### A. Sufficiency and Weight of the Evidence

{¶ 43} Willis presents his first two assignments collectively.

{¶ 44} Willis' first assignment of error states,

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT AS THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

{¶ 45} Willis' second assignment of error states,

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 46} Willis challenges the sufficiency and weight of the evidence supporting his convictions based on the argument that the state failed to prove his identity. Willis argues that there was inconsistent testimony from the two state's witnesses identifying him as one of the three suspects. He also challenges the state's evidence that he possessed a firearm, which he argues was premised on inconsistent witness testimony. He also argues that no physical evidence linked him to the recovered firearm.

### 1. Applicable Law—Sufficiency and Manifest Weight of the Evidence

{¶ 47} When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed,

would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9.  Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 48}  A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other."  *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14.  To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.  *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 49} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence.  *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.).  An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction.  *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

{¶ 50} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a

conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 12th Dist. Butler Nos. CA2019-05-075 and CA2019-05-076, 2020-Ohio-2673, ¶ 15, quoting *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

## 2. Analysis

{¶ 51} The first issue argued by Willis in these assignments of error is whether the state proved his identity as one of the three home invaders. To warrant a conviction, the evidence must establish beyond a reasonable doubt the identity of the accused as the person who committed the crime. *State v. Harner*, 12th Dist. Brown No. CA2019-10-012, 2020-Ohio-3071, ¶ 13. The identity of the accused as the perpetrator of the crime may be established by direct or circumstantial evidence. *State v. Raleigh*, 12th Dist. Clermont Nos. CA2009-08-046 and CA2009-08-047, 2010-Ohio-2966, ¶ 45. Circumstantial evidence has no less probative value than direct evidence. *State v. Helvey*, 12th Dist. Butler No. CA2021-01-008, 2022-Ohio-98, ¶ 21.

{¶ 52} Upon a thorough review of the record, we find that the state presented sufficient evidence to convince the average mind of Willis' identity beyond a reasonable doubt. We also conclude that Willis' conviction was supported by the greater weight of the evidence, and this is not one of the exceptional cases where the evidence weighs heavily against the conviction.

{¶ 53} Crystal and William consistently described three men entering their home. Crystal and William were also consistent in describing two "dark-skinned" black men and one either white or "light-skinned" man.

{¶ 54} Crystal described Suspect 1 as "dark-skinned," tall, and skinny. He needed a haircut. He was wearing something "dark on the top of him" and was wearing blue jeans. William also described one of the suspects as "dark-skinned," tall, and skinny. The

- 11 -

physical descriptions of this suspect resembled Willis' physical features.

{¶ 55} Three men entered the home and three men left the home, escaping in a maroon Buick SUV. This vehicle was spotted soon after by Deputy Gantz, who gave chase and followed the vehicle until it exited the highway. Soon thereafter Officer Jones resumed the chase in Sharonville.

{¶ 56} Officer Jones observed three men run from the vehicle. He chased one of those individuals, who was wearing a distinctive dark blue jersey displaying the number 9. A short time later, Willis was found hiding under the deck of a private residence, wearing the same clothing as the person who fled from the vehicle. He was located a short distance from the location of the Buick SUV. Officer Jones identified Willis at trial as the driver who fled the scene and as the individual whom he chased and ultimately arrested. Based on all of this testimony, there is really no doubt that Willis was one of the three men who entered the home to commit robbery and the other crimes charged, was the driver of the getaway vehicle, and was the person whom Officer Jones chased on foot.

{¶ 57} There is also physical evidence linking Willis to the crimes for which he was convicted. Crystal described the tall, skinny subject as wearing a cloth mask. Detective Abshear testified that Willis' DNA was located on a cloth gaiter that was inside a dark colored jacket found in the Buick. While neither Crystal nor William observed any of the suspects wearing a distinctive jersey, the fact that a jacket was found in the Buick SUV containing the cloth gaiter matching Willis' DNA suggests that Willis was likely wearing the jacket during the home invasion—thus making the jersey less visible or not visible to Crystal and William—and removed it before he ran out of the vehicle.

{¶ 58} Willis also argues that no one testified that he was in possession of a firearm and no physical evidence linked him to the recovered firearm. But while Crystal did not

see Suspect 1 with a gun, William testified that all three suspects had guns. Officer Jones noticed that while fleeing, Willis was reaching into the front of his pants in a way that suggested he was trying to retrieve a firearm. Officer Jones was so convinced of this that he drew his own firearm. The next day, officers recovered a firearm in the rear of the residence located at 10979 Chester Road. Officer Jones testified that this location corresponded to where he lost sight of Willis while chasing him. The fact that the firearm was found on Willis' path of flight connects Willis to the firearm.

{¶ 59} In sum, the direct and circumstantial evidence demonstrated that Willis was one of the three armed invaders who entered the home. Sufficient evidence supported the state's proof of identity, as did the greater weight of the evidence. Sufficient evidence and the greater weight of the evidence also supported the finding that Willis possessed a firearm during the home invasion. This is not one of the exceptional cases where the evidence weighed heavily against the conviction. To the contrary, the evidence overwhelmingly established that Willis was one of the three home invaders that day and that he possessed a firearm. Accordingly, we overrule Willis' first and second assignments of error.

## B. Consecutive Sentences

{¶ 60} Willis' third assignment of error states,

> THE RECORD DOES NOT SUPPORT THE SENTENCE IMPOSED BY THE COURT.

{¶ 61} Willis contends that the record does not support the trial court's finding that consecutive sentences were necessary to protect the public from future crime or to punish Willis.

### 1. Applicable Law

### a. Required Findings for Consecutive Sentences

{¶ 62} When imposing consecutive sentences, a sentencing court is required "to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. That statute states:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 63} Stated more simply, to impose consecutive sentences, a sentencing court must find (1) "that the consecutive service is necessary to protect the public from future crime or to punish the offender[,]" (2) "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public[,]" and (3) that at least one of the three conditions described in R.C. 2929.14(C)(4)(a), (b), or (c) apply. R.C. 2929.14(C)(4).

**b. Standard of Review—Felony Sentencing Appeals**

{¶ 64} R.C. 2953.08(G)(2) defines the standard of review for felony-sentencing appeals. *State v. Day*, 12th Dist. Warren Nos. CA2020-07-042 and CA2020-7-043, 2021-Ohio-164, ¶ 6. As applicable here, R.C. 2953.08(G)(2) provides:

> The appellate court may take any action authorized by this division if it *clearly and convincingly* finds either of the following:
>
> (a) *That the record does not support the sentencing court's findings under* division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That is otherwise contrary to law.

(Emphasis added.)

{¶ 65} "The consecutive sentence statute, R.C. 2929.14(C)(4), is one of the relevant statutes specifically mentioned in R.C. 2953.08(G)(2)." *State v. Richey*, 12th Dist. Clermont Nos. CA2022-08-038 thru CA2022-08-041, 2023-Ohio-336, ¶ 12. "Thus, there are two ways that a defendant can challenge consecutive sentences on appeal." *State v. Shiveley*, 12th Dist. Clermont No. CA2022-04-017, 2022-Ohio-4036, ¶ 7. "The defendant can argue either that the imposition of consecutive sentences is contrary to law because the trial court failed to make the necessary consecutive sentence findings required by R.C. 2929.14(C)(4), or that the record does not support the trial court's consecutive sentence findings made under R.C. 2929.14(C)(4)." *Richey* at ¶ 12, citing *Shiveley* at ¶ 7.

{¶ 66} In *State v. Gwynne*, 173 Ohio St.3d 525, 2023-Ohio-3851, the Ohio Supreme Court clarified the standard of review applicable to our review of consecutive sentence findings:

> The plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings, and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by

the record.

*Id.* at ¶ 5.

### 2. Analysis

{¶ 67} In this appeal, Willis does not dispute that the trial court made the consecutive sentence findings required by R.C. 2929.14(C)(4). Willis therefore concedes that the trial court's decision to impose consecutive sentences was not clearly and convincingly contrary to law under R.C. 2953.08(G)(2)(b).

{¶ 68} Instead, Willis argues—pursuant to R.C. 2953.08(G)(2)(a)—that the record does not support the trial court's consecutive sentence findings under R.C. 2929.14(C)(4). Specifically, Willis challenges the trial court's findings "that the consecutive service is necessary to protect the public from future crime or to punish the offender."

{¶ 69} We have reviewed the record of the sentencing hearing and the presentence-investigative report ("PSI"). R.C. 2953.08(F)(1) and (3). We have also considered the evidence presented at trial and the jury verdicts. R.C. 2953.08(F)(2). Based on that review, we do not find that the trial court's finding that consecutive sentences are "necessary to protect the public from future crime or to punish the offender" is clearly and convincingly not supported by the record.

{¶ 70} To the contrary, the trial court's findings in this regard are well supported by the record. The PSI demonstrates that Willis was 37 years old as of the date of the preparation of the PSI. The PSI reflects a lengthy history of involvement in the criminal justice system, beginning when Willis was confined in a juvenile correctional facility at age 17 as a result of being adjudicated for a burglary offense. As an adult, Willis was convicted of four felonies related to trafficking and possession of drugs and went to prison twice for these offenses. And the record reflects that Willis had an active felony warrant on the date of the offense at issue in this appeal. He was a fugitive from justice in

Hamilton County, where he was awaiting sentencing on a fifth felony—a weapons under disability charge. Willis' history of involvement in the criminal justice system demonstrated that prior prison sentences were not a sufficient deterrent to prevent Willis from committing future offenses and that Willis had a disregard for law and civil society. This supported the trial court's conclusion that consecutive sentences were necessary to protect the public from future crime or to punish Willis.

{¶ 71} In addition to his history of criminal offenses, the nature of the offenses in this case demonstrated that Willis was a danger to the public. Willis participated in an armed home invasion where he and the other suspects held children at gunpoint and threatened to shoot a child if he fled the scene. Crystal testified that one suspect threatened to shoot her in the leg. And William testified that one of the suspects kicked him in the face during the home invasion. Even if Willis was not the individual who committed all these specifics acts, he is responsible for these acts under the theory of accomplice liability. R.C. 2923.03(A) and (F).[3] These were egregious offenses and the potential mental health consequences for the victims—especially the children—could be significant.

{¶ 72} Willis counters that consecutive sentences were not necessary to protect the public or punish him because he showed remorse at sentencing, he had a difficult family situation with his mother currently suffering from cancer, and he had been addicted to drugs but was now sober. He also argues that none of the victims were physically injured. Willis argues that he should have been sentenced to concurrent sentences, reducing his time in prison.

{¶ 73} We do not find that Willis' difficult family situation or his past addiction to

---

3. The court instructed the jury on the theory of complicity with another in the commission of the offenses.

- 17 -

drugs demonstrate that he is less of a danger to the public. Many individuals face these kinds of difficult situations in life without resorting to robbing private citizens in their homes. At any rate, our standard of review requires us to uphold the trial court's consecutive sentence findings unless those findings are clearly and convincingly not supported by the record. On this record, we cannot find that the record clearly and convincingly does not support the trial court's findings.

{¶ 74} Moreover, we note that Willis could have faced considerably more time in prison. We note that the state recommended an aggregate prison sentence of 26 to 36 years. The prison term imposed by the court was essentially half of that requested by the state.

{¶ 75} In sum, we defer to the trial court's factual findings regarding consecutive sentences. *Gwynne*, 2023-Ohio-3851 at ¶ 5. We do not find that those findings are clearly and convincingly not supported by the record. *Id*. We overrule Willis' third assignment of error.

### III. Conclusion

{¶ 76} Sufficient evidence and the greater weight of the evidence supported Willis' convictions. We do not find that the trial court's consecutive sentence finding is clearly and convincingly not supported by the record.

{¶ 77} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.